# CASES DETERMINED

AT THE

## *January Term, 1892.*

---

VALIN, Administrator, Appellant, vs. THE MILWAUKEE &
NORTHERN RAILROAD COMPANY, Respondent.

*February 29 — March 22, 1892.*

*Railroads: Killing of person at highway crossing: Contributory negli-
gence: Court and jury: Supervening negligence of engineer after
discovering negligence of deceased.*

1. Plaintiff's intestate was killed at a railroad crossing by a locomotive
   which, with only a tender and snow-pilot, was running northward
   at a high rate of speed and had given no signal of its approach.
   Upon the evidence — showing, among other things, that no regular
   train was due at the time; that the deceased had just unhitched
   his horses from a logging sled at a point about thirty feet east of
   the crossing and was driving them westward across the track; that
   until he came within about fifteen feet of the track his view of the
   track to the south was greatly, if not wholly, obstructed by piles of
   logs; that it was a cold, blustering, snowy day, with the wind blow-
   ing from the northeast; that the locomotive approached with much
   less noise than an ordinary train; that when the deceased was within
   eight or nine feet of the track, one horse having its forefeet on the
   track, he saw the locomotive, then about 164 feet away, but had
   little or no opportunity to observe its rate of speed, and was struck
   by it before he could get across the track — it is *held* that the ques-
   tion of contributory negligence was one for the jury.
2. The engineer testified that when 540 feet from the crossing he saw
   the deceased and his team, the heads of the horses being then within
   eight or nine feet of the track; that they were headed as if they
   were going to cross, but he did not think they would cross; that
   they were then standing still, but when he got within a few yards

| 82 | 1 |
| --- | --- |
| 83 | 666 |
| 82 | 1 |
| 85 | 236 |
| 82 | 1 |
| 86 | 71 |
| 82 | 1 |
| 87 | 605 |
| 82 | 1 |
| 88 | 409 |
| 82 | 1 |
| 89 | 132 |
| 82 | 1 |
| 90 | 92 |
| 90 | 224 |
| 82 | 1 |
| d92 | 109 |
| 92 | 130 |
| 82 | 1 |
| 95 | 468 |
| 82 | 1 |
| 96 | 257 |
| 97 | 392 |
| 82 | 1 |
| 98 | 38 |
| 98 | 61 |
| 82 | 1 |
| e108 | 344 |
| 108 | 346 |

Valin vs. The Milwaukee & Northern R. Co.

of them the deceased "made a dive to go across;" that when he saw them he did not think it prudent to sound the whistle "for fear it would frighten the horses onto the right of way;" that he reversed the engine after striking them, and stopped the locomotive within the distance of 350 feet. Another witness testified that the deceased and his horses did not stop or stand still at any time after leaving the logging sled until they were struck by the locomotive. *Held*, that it was a question for the jury whether the engineer, after discovering the negligence, if any, of the deceased, might not by the exercise of reasonable care and diligence have avoided the accident.

3. The deceased not being a trespasser, such supervening negligence of the engineer need not have been gross negligence in order to authorize a recovery.

APPEAL from the Circuit Court for *Oconto* County.

This action is prosecuted by *Louis Valin*, as administrator of the estate of *Narcisse Craite*, against the railroad company, defendant, to recover damages sustained by the killing of his intestate at a crossing of the railroad company by a passing locomotive and tender. The answer was a general denial of the negligence charged, and upon trial before a jury the circuit court directed a verdict for the defendant, and from the judgment entered on it the plaintiff appealed. The contention on the part of the plaintiff was that the cause should have been submitted to the jury, and that the court erred in directing a verdict for the defendant; the defendant contending only that the plaintiff's intestate was guilty of such want of ordinary care contributing to his death as would prevent a recovery.

The accident happened at a point on the defendant's road in Oconto county known as "Hale & Chamberlin's Mill," at which, though not a regular station, trains stopped when flagged. The road runs due north and south at this point, and the mill, with the boarding house, sleeping room, and stable are on the west side of the track, and some cabins of lumbermen are on the east side. There were several families, in all about thirty or thirty-five persons, living at this

place and in the habit of crossing the track every day back and forth where the accident occurred. An old logging road which goes from Oconto to Porcupine lake, and had been used very generally for about twelve years, runs from the east side of the railroad over and across the track to the west, to the stable, and thence northwesterly to the mill, and where it passes over the track there is a slight cut through which the railroad runs, increasing as the road goes south to three or four feet in depth, and there is a ditch along the track on the east side, over which there is a culvert or plank bridge. The crossing at this point over the main track of the road was planked, constructed, and maintained by the company, and was in general use by Craite and others at all hours in passing and repassing about their lawful business, with the knowledge and acquiescence of the defendant. There was a spur or side track on the west side of the road, the switch post of which stands about 164 feet south of the crossing. The travel on the road over and across the crossing was mainly for logging and lumbering purposes, and there was an old road running from near the crossing parallel with the railroad, about thirty feet distant therefrom, south 200 to 300 feet, used by teams engaged in logging, in depositing logs in piles along and within five or six feet of the bank of the railroad. The deceased had been engaged for some three weeks in drawing logs on a sled with a span of horses to this point, and unloading them.

The accident occurred about noon, March 4, 1890, while Craite was passing over the crossing, driving a span of horses which he had just a few moments before unhitched from the sled used in hauling logs, from the eastern side of the track, and while he was driving his team from the sled to the stable on the west side, which was about ninety feet distant from the main track. The locomotive engine which struck them had on it a snow pilot, and was coming

from the south and going north.   About 100 rods or more south of the crossing there is a swamp through which the railroad passes, and its grade through the swamp is considerably lower, by about four or five feet, than on the elevated ground near the crossing.   Going north from this elevated ground or hilltop to the crossing, the grade is descending, and through a cut from three to four feet much of the way.   The road south of the crossing is straight for over a mile.   Considerable testimony was given to show that no signal, either by blowing the whistle or ringing the bell, was given of the approach and passage of the locomotive, and that it was passing at an extremely rapid rate; that it passed through a station three miles south at the same rapid rate, without giving any signal whatever.   The question to be determined depends principally upon the testimony of a Mr. Netzer, who stood at the time the accident occurred on the west side of the track, about sixty feet from it, and the testimony of the engineer in charge of the locomotive.   The particular points in the testimony, so far as material, are stated in the opinion.

For the appellant there were briefs by *Ellis, Greene & Merrill*, attorneys, and *E. H. Ellis*, of counsel, and oral argument by *E. H. Ellis*.

*Chas. E. Vroman*, for the respondent, to the point that the deceased was guilty of such want of ordinary care, contributing to his death, as will prevent a recovery, cited *Kearney v. C., M. & St. P. R. Co.* 47 Wis. 144; *Clark v. N. P. R. Co.* 47 Minn. 380; *Olson v. C., M. & St. P. R. Co.* 81 Wis. 41; *Penn. R. Co. v. Aiken*, 41 Am. & Eng. R. Cas. 571; *International & G. N. R. Co. v. Kuehn*, 35 id. 421; *Woodard v. N. Y., L. E. & W. R. Co.* 106 N. Y. 369; *Langhoff v. M. & P. du C. R. Co.* 23 Wis. 43; *Haas v. C. & N. W. R. Co.* 41 id. 44; *Williams v. C., M. & St. P. R. Co.* 64 id. 1; *Schilling v. C., M. & St. P. R. Co.* 71 id. 255; *Louisville & N. R. Co. v. Crawford*, 44 Am. & Eng. R.

Cas. 568; *Daily v. R. & D. R. Co.* 42 id. 124; *Freeman v. D., S. S. & A. R. Co.* 37 id. 501; *State v. M. C. R. Co.* 76 Me. 357; *Indiana, B. & W. R. Co. v. Hammock,* 32 Am. & Eng. R. Cas. 127.

PINNEY, J. The evidence of negligence on the part of the company, to say the least, was quite sufficient to require that the case should be submitted to the jury, unless the alleged negligence of the deceased contributing to his death was so clearly and conclusively proved as to justify the court in taking the case from the jury and directing a verdict for the defendant; and the vital question is whether, under the peculiar circumstances of the case, the alleged negligence of the deceased is one of fact for the jury or of law for the court.

The rule is well settled that, in order to justify the court in taking a case from the jury, the question must be wholly one of law; for if it depends upon controverted facts, upon what facts the testimony establishes, the credibility of witnesses, or what inferences or conclusions ought to be drawn from the testimony, then it is clearly a question to be submitted to the jury. If the jury arrive at a conclusion wholly unwarranted by the evidence, or which may be imputed to passion, sympathy, or prejudice, so that upon the whole case the court can see that justice has not been done, then for these or kindred reasons the court, in the exercise of sound discretion, may set aside the verdict and grant a new trial. But the giving of an absolute direction to the jury to find a verdict is a matter of legal right, founded on facts positively established. If the case involves a fair question of fact for argument, it is for the jury. Negligence is inferred as a conclusion from the facts and circumstances of the particular case, instead of being a fact in and of itself; and inasmuch as each case depends so much upon its peculiar combination of facts and circumstances, and the inferences

to be drawn from them, a decision in it cannot be considered as a precedent binding or controlling in other cases. "Negligence is almost always to be deduced as an inference of fact from several facts and circumstances disclosed by the testimony, after their connection and relation to the matter in issue have been traced, and their weight and force considered. In such cases, if unbiased men would differ as to such inferences, then they cannot be made without the intervention of a jury, although all the witnesses agree in their statements, or there be but one statement which is consistent throughout." Per CASSODAY, J., in *Hill v. Fond du Lac*, 56 Wis. 242, cited and confirmed in *Nelson v. C., M. & St. P. R. Co.* 60 Wis. 323. In the case last mentioned it was held that "it is only when the inference of negligence, or the absence of it, from the undisputed facts proved, is inevitable, that the court will direct a verdict. In all cases in which such inference is in doubt, giving to the testimony the construction most favorable to the party charged therewith, the question of negligence is for the jury." *Langhoff v. M. & P. du C. R. Co.* 19 Wis. 496; *Nelson v. C., M. &. St. P. R. Co. 60 Wis.* 320, and cases there cited; *Kaples v. Orth*, 61 Wis. 533; *Hoye v. C. & N. W. R. Co.* 62 Wis. 666; *Hoye v. C. & N. W. R. Co.* 67 Wis. 14, 15; *Seefeld v. C., M. & St. P. R. Co.* 70 Wis. 216; *Winstanley v. C., M. & St. P. R. Co.* 72 Wis. 376; *Duame v. C. & N. W. R. Co.* 72 Wis. 523; *Abbot v. Dwinnell*, 74 Wis. 525; and many other cases in this court might be cited to the same effect.

It is equally well settled by adjudicated cases that the burden of proof of contributory negligence is ordinarily on the defendant. *Randall v. N. W. Tel. Co.* 54 Wis. 147; *Kelly v. C. & N. W. R. Co.* 60 Wis. 482; *Bessex v. C. & N. W. R. Co.* 45 Wis. 483; *Railroad Co. v. Gladmon*, 15 Wall. 401. And in any event, however it may appear, the proof of contributory negligence must be clear and decisive,

not leaving room for impartial and unbiased minds to arrive at any other conclusion, in order to warrant any absolute direction to the jury on that ground.

In view of these well-established principles, we are to consider whether the facts and circumstances disclosed in the testimony warranted the direction in question.

The defendant, in support of the ruling of the circuit court, relies (1) upon the general rule, often repeated in cases of this character, that one approaching a railroad crossing, who may by looking have a timely view of an approaching train, is bound to look and listen for its approach before attempting to cross the track, and that a failure to do so is negligence; (2) that immediately before the locomotive reached the crossing the deceased saw it, while yet in a position of safety, but rashly and recklessly rushed in before it, and, in attempting to cross the track, lost his life.

The particular facts and circumstances of the cases seem to modify most materially the view taken by respondent of the conduct of the deceased. On the day in question the deceased was engaged in drawing logs with his team, and unloading them on the south side of the logging road, near the crossing, in piles extending along the bank of the railroad in a southern direction, as already mentioned. He had been for about three weeks similarly engaged, and was, no doubt, familiar with the time of passage of day trains during his usual working hours. The day was a cold, windy, blustering day. One witness describes it as a dark, cold day. It was snowing some and the snow was drifting, the wind blowing, as one witness said, from the northeast; and this was calculated to take away from Craite the sound of an approaching train from the south, or any signal of such by bell or whistle. The size and height of the pile of logs and stumps was such as to intercept and shut off any view of the approaching locomotive from him after he had unloaded his logs and driven around to a point on

the lumber road about twenty-five or thirty feet from the track he was to cross, where he unhitched his horses from the sled in order to go over the crossing to the barn on the west side of the railroad. There is no evidence to show what observations, by way of looking and listening, he had taken up to this time; and, as the road ran due south for nearly two miles, it is but fair to assume, in view of what he afterwards did, that he did not discover any evidence of danger.

There was no regular train going north or south at or about that time of day. The locomotive and tender, with a snow pilot, was passing most unexpectedly, for some special purpose, probably to drive the drifted snow from the track. It was running at a rapid and indeed high rate of speed, as some witnesses testified. It ran through Maple Valley in that manner, a place three miles to the south, without making any signal by bell or whistle, and it made none of its approach to the crossing, as witnesses testify. Its approach was quite noiseless, as compared with that of an ordinary train. Netzer, the witness who saw more of this unfortunate occurrence than any one now living, and who was on the western side of the track, and in a more favorable position to hear, considering the direction of the wind, than the deceased, says he could not hear it until it came within seven or eight rods of the crossing, although he saw it when 120 rods down the road. About that distance or more south of the crossing it ran through a swamp, where for some distance the grade was about four or five feet below that on either side of the swamp; that the grade was upward from the swamp to the top of a small hill, through which there was a cut three or four feet deep, and thence there was a slight down grade for a distance of 540 feet to the crossing in question, where the cut almost wholly ceased, and the crossing was nearly on a level with the adjacent ground.

What Craite did or saw or heard while at the log pile unloading his logs no one pretends to know. He was in a position to see and hear an approaching locomotive as well as wind and snow and intervening obstacles already described would admit. It is fair to assume that he was properly observant, and looked and listened, and saw nothing to admonish him against taking his team across the track. From this time there is no living witness to speak of his acts, or tell of what occurred, until death closed his lips against any explanation on his part of his conduct, except the engineer and Netzer, who stood at the time about sixty feet west of the crossing on the lumber road, and about eighty-five feet from where the deceased unhitched his team from the sled, and from whence he at once proceeded to drive his team over the crossing, standing behind them with the lines in his hands, which brought the horses between the deceased and Netzer, and necessarily interfered with Netzer's ability to accurately observe all he did.

Netzer was asked whether there were logs or other things to obstruct the view from the place where Craite unhitched his horses till he got to the railroad track, and he answered: "Yes; there were some logs lying all along. There were some cedar logs right there for a distance of four or five logs, with the snow and all, six or seven feet high. He was about five feet ten inches. He could see down the track for a small distance,— three or four hundred feet,— but that would be all, because the logs were piled close to the stump, six or seven feet high. There is a stump right close to the road where it crosses the railroad track. The pile of cedar logs did not extend east and west over twenty or twenty-five feet. The teamsters drove in there and rolled off their logs, turned around, and went for more. As they rolled them off they drove up there tolerably near the ditch, say four or five feet, and they unloaded right south there for ten or twelve rods. They had them piled,

with snow and all that was there, about five, six, or seven feet high." He also said: "There were some other obstructions,— old logs lying all along the track, and stumps turned up, for fifty or sixty rods south, that had been hauled there. Standing within ten or fifteen feet of the rail, I should say, all a man could see would be the smokestack and smoke when the locomotive was down in that swamp. He took the tugs off and the neck-yoke, and started across,— *kept going on; didn't go very fast.* Came to the bridge over the ditch near the east rail, and the off horse drew off into the snow to the north, and the near one was on the off track, and when I saw the nigh horse he was ahead of the other, and he had his forefeet on the railroad track, and that is the last I saw of them. A little before the engine came up to him the snow was flying so I could not see what struck him." This witness saw the approaching locomotive when it was quite a long way off, and observed its progress. He testified that Craite did not look for it until the engine was fifty or sixty feet away. Being asked where Craite was when he looked to see the engine, he said: "Well, he was behind the horses. I can't say. I wasn't on his side. The team was between me and the man. When I first noticed *that he looked at the engine* it was about fifty or sixty feet away. It was at the switch [164 feet south of the crossing]. *The near horse's feet were but just over the east rail.* He seemed to urge his horses. Heard him say ' Get up, go on;' and saw him shaking the lines. One horse got across. The other was killed, and thrown off on the east side of the track. Craite looked *when within eight or ten feet of the track.* I did not say a word to him. I saw the smoke of the engine when it was one hundred and twenty rods away. *I did not say a word to him. I supposed he was going to get across before the engine came along.*" Being asked if, after he got west of the obstructions, there was anything to prevent

his looking right down the track before his horses stepped over the rail, he answered " Well, I don't remember now. Can't tell how far south you could see when fifteen feet from the track." Another witness said: " The logs were piled within five or six feet of the bank of the railroad."

The engineer said: "I first saw them [Craite and the horses] when we were on the top of the little hill, about five hundred feet from the crossing. The heads of the horses seemed to be quite a way back from the rail, say *about eight feet*, facing a little north, I guess they were. The young man *was standing with the horses.* Seemed to be behind them. When I got *within a few yards* of him he tried to cross the track, *and that is all I can say about it.* I had no reason to think he was going to cross when I first came in sight of him. It seemed to me as if he was looking towards me when I first saw him. I didn't see any motion he made at the time. Was at the switch, or a little north, when he started to go across [164 feet from the crossing]. When I came onto the brow of the hill, there was no occasion for an alarm whistle. *It would have been a bad thing to give an alarm whistle, because they seemed to be standing still,* and, if I had, *perhaps I would have frightened those horses into that right of way.* When they attempted to cross I tried my best to shut off and reverse the engine. I took it coolly. *When I first saw them, they were headed as if they were going to cross. They seemed to be standing still. Their heads were about eight feet from the track. The man was not walking. I am not sure of that.* No, sir; I did not notice that any effect on the engine was caused by the collision, any more than if it had struck nothing. I went on about three hundred or three hundred and fifty feet, when the engine stopped. When I saw him *attempt to cross* I shut off my engine, applied the air, and reversed her. *I had not anything of that accomplished when the engine struck; just as it struck I was try-*

*ing to shut off. I guess we had struck the man and horse when we commenced to try to reverse the engine.* I reversed it *afterwards.*" The witness Netzer, standing about thirty or forty feet away, said: "After the horses were un-hitched from the sleigh, and started from the tongue, they moved *right along* till they got on the track. This man *did not stop, he kept on behind the horses.* When I first saw the engine coming Craite was just going behind the horses, taking hold of the lines, getting ready to come across."

A topographical survey and diagram of the *locus in quo* was made by the defendant several months after the accident, but not until the snow to the depth of about two feet had gone off and the logs were removed, showing lines of vision south from the logging road, from which it appeared that, from a point twenty feet east of the track, one could see south along it 853 feet; that from a point fifteen feet east of the rail an engine was visible 1,300 feet.

The distance the deceased had to travel from where he unhitched from the sled was a short one,— only about thirty feet. There is no reason to think that when he had started he had had any notice of the approach of the loco-motive,— nothing to show that he had not been vigilant and careful. For full half of the distance to the rail the evidence shows that his view at that time was greatly, if not entirely, obstructed. When he had reached a point fifteen feet east of the rail, a distance of six or seven feet more would bring him to the point where the forefeet of his near horse were over the rail, and where Netzer says he did look, and then the locomotive was at the switch post, 160 feet south of the crossing. Having had no previous knowledge of its approach, owing to the failure of those in charge to give any signal, he had a right to assume there was until then no danger, and he was no doubt greatly confused and alarmed when he did look,— was so far committed to his

Valin vs. The Milwaukee & Northern R. Co.

attempt to cross, with his team partly on the track, that he had to choose between two alternatives without the means of forming a safe or prudent judgment. He had no time to observe the unusually high rate of speed of the locomotive, no time for deliberation, and although Netzer says Craite did not look before then, in view of the fact that the team, as he says, was between him and Craite, he could not have known that he did not look before and without making any discovery. The distance was so very short, the time so very brief, when a few seconds counted in fact for everything, that it is difficult to say that the facts and circumstances clearly and decisively established negligence on the part of the deceased. With the locomotive at ten rods' distance, he might from his standpoint have thought he could succeed in crossing in safety, and that such would be the better course. Netzer, an intelligent witness, observing the occurrence, thought he would get across and uttered no warning, and but for the high rate of speed he might have succeeded. It would be most unjust to hold that he was chargeable with knowledge of the unusual rate of speed of the locomotive, with neither means nor opportunity to judge of the fact, when no notice whatever was given (as we must assume in view of the state of the record) of its approach until the noise of its ordinary motion, to be heard only eight or ten rods, announced the fact.

Contributory negligence is not always chargeable upon the failure to exercise the greatest prudence or the best of judgment, in cases where a person is required to act suddenly or in an emergency. *McClain v. Brooklyn C. R. Co.* 116 N. Y. 470; *Penn. R. Co. v. Werner*, 89 Pa. St. 59; *Duame v. C. & N. W. R. Co.* 72 Wis. 530–534; *Gumz v. C., St. P. & M. R. Co.* 52 Wis. 676–677. As said by ORTON, J., in *Duame v. C. & N. W. R. Co., supra:* " If, by the negligence or omission of those in charge of the train, the plaintiff's vig-

ilance was allayed, they are not to impute the consequences of their acts to his want of vigilance, and, if their acts brought him within the boundaries of peril, they must answer for it." *Penn. R. Co. v. Ogier*, 35 Pa. St. 71, 72; *Hahn v. C., M. & St. P. R. Co.* 78 Wis. 396; *Abbot v. Dwinnell,* 74 Wis. 514; *Ernst v. H. R. R. Co.* 35 N. Y. 35.    That the deceased was just entering upon the verge of manhood, with the instinct of self-preservation strong within him, and not likely rashly to encounter deadly peril or great personal danger, is a circumstance not without its weight, in such a combination of facts and circumstances, to repel the imputation of negligence.    The fact that he saw the locomotive when it was 164 feet distant from him, if considered by itself and not qualified by other circumstances, would have strongly tended to show negligence; but even then it would scarcely justify the court in saying that there was negligence as a matter of law, independent of proof of apparent rate of speed and opportunity to estimate it.    Upon a careful consideration of the evidence, we think that the proof of contributory neglience is not so clear and decisive as to justify the absolute direction to the jury to find for the defendant.    The following cases will be found to further support our conclusion: *Massoth v. D. & H. Canal Co.* 64 N. Y. 529, 530; *French v. Taunton Br. R. Co.* 116 Mass. 540; *Craig v. N. Y., N. H. & H. R. Co.* 118 Mass. 437; *Schum v. Penn. R. Co.* 107 Pa. St. 8, 13, 14.    The case of *Olson v. C., M. & St. P. R. Co.* 81 Wis. 41, is clearly distinguishable. There the plaintiff had timely notice of the near approach of the train, and his course was taken with full knowledge of the fact.

There is, however, another aspect of the evidence which, we think, made it the duty of the court to submit the case to the jury, even conceding that the evidence showed clearly and decisively contributory negligence on the part of the deceased.    The engineer saw the deceased and his

team when he reached the top of the hill after coming up out of the swamp, 540 feet before he reached the crossing, and he says that the heads of the horses were within eight or nine feet of the track, and that they were headed as if they were going to cross, though he says he did not think they would cross; that they were *standing still,* the man behind his team; that when he got within a few yards of them *the man made a dive* to go across; that when he saw them he did not think it prudent to sound the whistle, for fear it *would frighten the horses onto the right of way.* They were already on the right of way, and it is understood that the whistle is to be blown and the bell sounded to warn men and frighten animals off the track or from going upon it. Netzer contradicts this witness squarely as to the man and horses standing still, and says that from the time they left the sled they moved steadily forward without stopping. The connection of the engineer with the fatal occurrence is such as to justly subject his testimony to criticism and to furnish reasons for doubting its candor and fairness. A jury might, perhaps, think his desire of self-vindication stronger than his memory of facts. The reason he gives for not blowing the whistle is unworthy of a moment's consideration, and possibly suggestive of a consciousness that he did not in this emergency do his plain and obvious duty. Animals, and much less human beings, because they approach the track of a railway and indicate a purpose or are about to cross under circumstances making it dangerous to do so and negligent as to human beings, are not outlawed; and those in charge of locomotives and passing trains must not neglect to act with the care, caution, and tenderness of human safety and life plainly required by the common dictates of humanity. It appears that the locomotive on this occasion was readily stopped within a distance of 300 or 350 feet, but the engine was not reversed until after the fatal shock. When the engineer discovered

Valin vs. The Milwaukee & Northern R. Co.

the situation of the man and the team, had he sounded the whistle, slowed up, or had instantly shut off and reversed his engine, the fatal occurrence probably would have been prevented. A jury might believe Netzer's testimony that the deceased was moving steadily and certainly forward to cross the track when the engineer first saw him with his team, headed, as he says, as if to cross the track, and that the facts were such as to fairly admonish him to take immediate and effective action to avert the danger; and that his failure to do so was negligence on his part, making the company liable for the fatal consequences which ensued. Here was a question of credibility of the testimony of the engineer, particularly when contradicted on a vital point, as we have seen he was, by Netzer.

The negligence of the deceased will not enable the company to escape liability if the act which caused the injury was done by the defendant after it discovered his negligence, and if the defendant could have avoided the injury in the exercise of reasonable care. *Morris v. C., B. & Q. R. Co.* 45 Iowa, 32, and cases there cited. This rule is well sustained by numerous authorities; and such supervening negligence, as the deceased was not a trespasser, need not be *gross* negligence in order to authorize a recovery. In such a case, it is enough that the defendant, by the exercise of reasonable care and prudence, might have avoided the consequences of the plaintiff's negligence. *Inland & S. C. Co. v. Tolson*, 139 U. S. 551, 558; *Radley v. L. & N. W. R. Co.* L. R. 1 App. Cas. 754–759; *Scott v. D. & W. R. Co.* 11 Ir. C. L. 377; *Austin v. N. J. Steamboat Co.* 43 N. Y. 82. The evidence on this point required the submission of the case to the jury, and for error in directing a verdict for the defendant there must be a new trial.

*By the Court.*— The judgment of the circuit court is reversed, and the case is remanded for a new trial.