THE KANSAS CITY-LEAVENWORTH RAILROAD COMPANY v. WILLIAM LANGLEY.

No. 13,814. (78 Pac. 858.)

SYLLABUS BY THE COURT.

1. PRACTICE, SUPREME COURT—*Case-made—Order Extending Time.* Where the time is extended and a case-made is completed under the provisions of chapter 380, Laws of 1903, it is not invalid because the order of the judge extending the time was not filed with the clerk, the proviso requiring such filing being directory, and not mandatory.

2. PERSONAL INJURIES—*Contributory Negligence—Presumption of Reasonable Care of Another.* One placed in a position of danger by the negligence of another has a right to presume that such other will take all necessary available means to avoid inflicting injury, and if he may reasonably suppose that no injury will be inflicted upon him by the exercise of such care he cannot be charged with contributory negligence.

3. ——— *Contributory Negligence — Emergency.* Where, by the negligent act of another, one is placed in a position of danger which requires immediate and rapid action, without time to deliberate as to the better course to pursue, he is not held to the strict accountability required of one situated under more favorable circumstances. Contributory negligence is not necessarily

chargeable to one who fails to exercise the greatest prudence, or the best judgment, in such a case.

4. RAILROADS — *Consolidation — Assumption of Obligations.* By one of the articles of the charter whereby several railroad corporations were consolidated it was provided that such consolidation was "subject to all of the obligations and liabilities to the state which belonged to, or rested upon, any of such corporations making such consolidation." This assumption followed in terms the requirement of the statute. *Held,* that this was an assumption of the obligations of each of the constituent corporations arising *ex contractu* or *ex delicto.*

Error from Leavenworth district court; JAMES H. GILLPATRICK, judge. Opinion filed December 1, 1904. Affirmed.

*Atwood & Hooper*, for plaintiff in error.

*J. C. Petherbridge,* and *B. F. Endres*, for defendant in error.

The opinion of the court was delivered by

CUNNINGHAM, J.: Defendant in error moves to dismiss this proceeding for the reason that no legal case-made is attached to the petition in error.

It seems that after chapter 380 of the Laws of 1903 took effect an extension of time within which to make and serve a case-made was obtained by the plaintiff in error, but that such order was not filed with the clerk of the district court as provided in that chapter, and it is claimed that the requirement so to file is mandatory, and a failure to do so renders further proceedings in the matter of the settlement and signing of the case-made void and ineffectual. We do not take this view. There is nothing in this act which indicates that the filing of the order is an essential prerequisite to its becoming operative.

Ordinarily the paper on which the order of a court or of a judge at chambers is written need not be de-

posited in the clerk's office to make it effective. It is well, as a measure of publicity and for its preservation, that it should be, but unless it appear that such disposition is a prerequisite to its becoming effective the requirement that it should be so filed must be held to be directory, and not mandatory. The rule, as stated by this court in *Jones v. The State of Kansas, ex rel. Atherby and Kingsbury*, 1 Kan. 273, 279, and reiterated in *The State v. Yordi*, 30 Kan. 221, 223, 2 Pac. 162, is :

"Unless a fair consideration of the statute shows that the legislature intended compliance with the provision in relation to the manner to be essential to the validity of the proceeding, it is to be regarded as directory merely."

We do not think that it can be fairly said that the provision relative to the filing of the order of extension of time was intended to be essential to the validity of such extension. The proviso in which this requirement is embedded is merely incidental. No duty is imposed upon the party obtaining the extension to file such order. Indeed it does not appear that the order is to come to his hands. It apparently serves no purpose except to give notice to any one interested that the extension has been granted. We can say, at least, that in the absence of any showing of prejudice to the opposite party by the failure to file it, the case-made is not invalidated thereby.

The action was one to recover damages because of a personal injury suffered by the defendant in error from being struck by one of the electric street-cars of plaintiff in error. The defendant in error was driving south with a two-horse team upon one of the streets in Leavenworth. He had a light load, and another man was riding with him. He saw approach-

ing him from the south two heavily loaded three-horse coal wagons. There was not room for him to pass these wagons between the east curb of the street and the railroad company's track on the west. He therefore turned to the west and attempted to cross the track diagonally. At the same time, looking to the north, he observed a street-car standing upon a passing-track, about 175 feet away. His horses crossed the track without accident, but as the hind part of the wagon was crossing one of the horses fell down. On cross-examination Langley testified as follows:

"Ques. Then the situation is this: Your horse had fallen; you looked up and saw a car coming towards you; you noticed enough to know that it was coming in your direction, to form an opinion that it was coming at the rate of from five to eight miles an hour, and that you did n't see any man on the platform, and if he had been there you would have seen him, you think? Now, have I got it right? Ans. I certainly would have seen him if he had been there.

"Q. And yet you stayed right in your wagon to pull that horse up? A. I was so confused and excited over the horse being down and trying to get him up—

"Q. You still stayed in the wagon? A. I did, sir.

"Q. So that you knew if there was n't any man on that front platform there was n't anybody at the machinery that controlled the movement of the cars, did n't you? A. Well, I did n't see any one; no, sir.

"Q. You said you did n't see him, and if he had been there you would have seen him—that was your statement? A. I would have seen him if he had been there; yes.

"Q. So that you looked and saw no man, and saw no man at the end of the car where the machinery was that controls the movement of the car? A. No, sir; there was no man there that I could see.

"Q. Then, as you looked back and took that situation in, you saw a car coming with no man in control of it, did nt you? A. At that point?

Railroad Co. v. Langley.

"Q. At that point just when you looked, after your horse had fallen.  A. Yes, sir.

"Q. You turned your back then right on that car that was coming towards you without a man to control it, and began to haul at your horse?  Is that a fact?  A. I did, sir—paid no further attention to the car.

"Q. How far was the car away at the time you saw it coming towards you without a man in control of it and at the point you were beginning to haul your horse up?  A. Something over a block, to the best of my judgment.

"Q. Which is approximately 300 feet?  A. Yes, sir.

"Q. And the next you knew was that you were on the pavement?  A. When I came to myself I was on the pavement."

On direct examination Langley testified substantially as follows:

"As quick as my horse fell I threw up my hands towards the car and hollered.  Then I tried to assist my horse in getting up by bracing my foot against the driver-board of the wagon and holding a very tight rein on the horse.  The horse was lunging and making an effort to get up, and of course what I was doing would brace him and help him to get up. . . . Just before I turned to drive across the track I looked up and the car was on the side-track or switch.  As I started to cross the track I glanced over my shoulder up the street to look for the car, and saw it on the side-track or switch just moving off, which was about one block away, or 300 feet.

"Ques. You noticed there was no motorman on that front car, did n't you?  Ans. I did not."

While Langley seems somewhat mixed as to whether there was a motorman in charge of the car, it was shown by the evidence of others, and specially found by the jury, that there was.

The man who was riding in the wagon with Langley testified substantially as follows :

"I was riding in the wagon with Langley at the time he was injured. We were driving down Fifth street, coming to market, and just as we got to Ottawa street there was a car standing on the switch at the west side, and another car coming from the west on Ottawa. When we saw the car was going to cut us off from passing down on the west side of Fifth we kept down on the east side of the track for some distance, when we met two three-horse wagons heavily loaded with coal. We could not get by them handy, and we attempted to cross the track to the southwest, and just as we crossed the track one of the horses slipped and fell. I jumped out of the wagon and ran back 75 or 100 feet, throwing up both hands and hollering and motioning for the car to stop. These coal wagons took up pretty nearly the whole of the street on that side. One of them was in the center of the street, and the other kind of cornering across the street, and we saw that we would not make it there, and we had to get out of the way of the car and out of the way of the teams. We aimed to cut across the tracks and come over on the other side of the street, and the horse fell. If the horse had not fallen we would have had ample time to get away. The horse fell just after he crossed over the track, which left the left hind wheel of the wagon standing in the center of the track."

"Ques. Was there any bell rung as they came down that incline towards the wagon? Ans. No, sir.

"Q. I will ask you whether or not, after the car had passed you and you picked up the wreck, whether the employees in charge of the track, or any one, had used any sand in attempting to check the speed of the car? A. Not that I saw.

"Q. Did you notice along the rails? A. Yes, sir.

"Q. Would the sand, having been run over by the wheels of the car, make such an impression that you could have told whether fresh sand had been used or not? A. Yes, sir.

"Q. Did you see any indication of any sand having been used at that time? A. No, sir."

"I saw the collision. The car ran into the wagon wheels and struck the wheels pretty near the center. It shoved the wheels around sideways and gave it a front pitch. This shoving assisted in raising the horse onto its feet and broke the neck-yoke in two. The next thing I saw, Langley and the spring seat were going up in the air. He fell across the seat with his back and side, and his shoulders and head in a tub of fish."

Other evidence of the plaintiff showed that the track was an easy down grade toward the south; that no bell was sounded upon the car, nor sand used to arrest its progress, as it approached Langley's wagon; that at the rate it was going it could have been stopped after the motorman might have observed that the horse was down and before the car had reached the wagon. The car, however, ran into the rear end of the wagon, throwing Langley to the ground and inflicting the injury alleged. A demurrer to plaintiff's evidence was overruled, and the case went to the jury, who found a verdict in favor of Langley.

Complaint is here made of the overruling of this demurrer, the claim being that the plaintiff was guilty of such contributory negligence as to preclude his recovery. It is not claimed that there was negligence in his endeavoring to cross the track, as this, it seems, it was necessary for him to do; and the testimony shows that if his horse had not fallen he would have had ample time in which to cross; but it is claimed that after the horse had fallen it was his duty, upon seeing the car approaching, and having ample time, to extricate himself from danger, leave his wagon and horses to their fate, and thus save himself at their expense. The plaintiff in error says in its brief:

"A person who is in a position of danger must ex-

ercise ordinary care to extricate himself from that position, and if he fails to do so he cannot recover, even if the party who caused the injury is guilty of negligence.''

Without question this is a correct general statement of the law; but this general statement leaves to be determined by the trier of fact what is the ordinary care required, under all the circumstances of the case.

We do not think that, under the circumstances of this case, the court was warranted in saying, as a matter of law, that Langley was bound to abandon his efforts to get his horse up and his wagon out of the way of the approaching car, although he knew of the approach of the car. He is presumed also to have known the fact that it could have been stopped in time to avoid the collision, and he had a right to sup-· pose that the motorman, seeing the inextricable position which his wagon occupied, would apply the necessary means to stop the car. His continued effort to get his horse up and the wagon off the track was not so obviously imprudent, if imprudent at all, as to warrant the court in declaring it to be culpable negligence.

It also appeared from the evidence that when the horse fell the man who was riding with Langley jumped out of the wagon and ran up the track toward the approaching car, some 75 or 100 feet, waiving his hands and hallooing, to give warning to the persons in charge of the car in time to stop it before striking the wagon; at least, the evidence tended to show that fact, and if the jury so found from it the company was most culpably, and perhaps wantonly, negligent. Certainly, in view of all this, the court ought not, by sustaining defendant's demurrer to plaintiff's evidence, to have held, as a matter of law,

that it was the duty of plaintiff to abandon his wagon and team and seek his own safety in flight.

Again, where one, by the negligent act of another, is placed in a position of danger which requires immediate and rapid action, without time to deliberate as to the better course to pursue, he is not held to the strict accountability that is required of one situated in more favorable circumstances.   Contributory negligence is not necessarily chargeable to one who fails to exercise the greatest prudence, or best judgment, in a case where he is required to act suddenly or in an emergency.   (*Valin v. The Milwaukee & Northern R. Co.*, 82 Wis. 1, 51 N. W. 1084, 33 Am. St. Rep. 17 ; *Traction Co. v. Scott*, 58 N. J. L. 682, 34 Atl. 1094, 33 L. R. A. 122, 55 Am. St. Rep. 620 ; *Harrington v. Los Angeles Ry. Co.*, 140 Cal. 514, 74 Pac. 15, 63 L. R. A. 238, 98 Am. St. Rep. 85.)

In section 89 of volume 1 of Shearman and Redfield on Negligence, fifth edition, the rule is stated as follows :

"In judging of the care exercised by the plaintiff, reasonable allowance is always made for the circumstances of the case ; and if the plaintiff is suddenly put into peril, without having sufficient time to consider all of the circumstances, he is excusable for omitting some precautions or making an unwise choice, under this disturbing influence, although, if his mind had been clear, he ought to have done otherwise."

The same rule was well stated in *Edgerton v. O'Neil*, 4 Kan. App. 73, 46 Pac. 206, as follows :

"Where one acts erroneously through fright or excitement, induced by another's negligence, or adopts a perilous alternative in the endeavor to avoid an injury threatened by such negligence, or when he acts mistakenly in endeavoring to avoid an unexpected

danger negligently caused by the defendant, he is not guilty of contributory negligence as a matter of law.''

Many authorities to this effect might be cited.

The court submitted the question of contributory negligence, under proper instructions, to the jury, and in this was clearly correct.

The action was originally brought against the Leavenworth Electric Railroad Company. While it was pending this company was consolidated with others, and the consolidated company took the name of the present plaintiff in error, the Kansas City-Leavenworth Railroad Company. In due time the action was revived in the name of the consolidated company, and prosecuted to judgment against it. In article 1 of the charter of consolidation it was provided that the new company should ''own and control the connected lines of railroads of said several corporations, with all the rights, powers, privileges, and immunities, and subject to all of the obligations and liabilities to the state, which belong to, or rest upon, any of such corporations making such consolidation.'' Article 10 provided : ''The contract obligations of each of said constituent companies shall be, and are, hereby assumed by said consolidated company.''

The plaintiff in error here contends that the effect of these two provisions is to exclude all obligations of the individual constituent companies not arising upon contract; that the specific assumption of contract liabilities only, found in article 10, by necessary implication excludes the assumption of liability arising upon tort, under the rule, *expressio unius est exclusio alterius*, and, hence, that the judgment in this case against the new company was not warranted. In support of this view it cites *Berry v. K. C. Ft. S. & M. Rld.*

*Co.*, 52 Kan. 759, 34 Pac. 805, 39 Am. St. Rep. 371, where it was held that, in the absence of stipulations to the contrary, the consolidated company is answerable for all of the obligations of the constituent companies, including those arising upon tort. It therefore argues, *per contra*, that, inasmuch as there is a stipulation in article 10 assuming only contract obligations, this amounts to a stipulation excluding obligations upon tort. In the absence of general law upon the subject, or of other provisions in the articles of consolidation, this might be quite cogent argument.

In the very able and exhaustive article on corporations by Judge Thompson, found at page 303 of volume 10 of the Cyclopedia of Law and Procedure, the general rule, in the absence of *statutory or contractual* agreements found in articles of consolidation, is stated as follows :

"As a general rule the new company succeeds to the rights, duties, obligations, and liabilities of each of the precedent companies, whether arising *ex contractu* or *ex delicto.*"

This rule is well supported by the citations there found, as well as by the text-writers. (Field, Corp. § 435.; 3 Wood, Rly. Law, § 486 ; 2 Mora. Corp., 2d ed., §§ 809, 955, 956.)

More than this, the first section of the charter of the consolidated companies, as above quoted, following the language of the statute which authorizes such consolidation (Gen. Stat. 1901, § 5870), provides that the consolidated company is subject to all of the obligations and liabilities to the state which belong to, or rest upon, any of the constituent corporations.

This language, as construed in *Berry v. K. C. Ft. S. & M. Rld. Co.*, *supra*, embraces obligations and demands arising out of tort as well as upon contract,

the interpretation being that the assumption is of all obligations and also of all liabilities to the state which belonged to, or rested upon, the constituent companies.   The argument used in arriving at this conclusion in the Berry case is lucid and cogent, and cannot be strengthened..   We hold that not only did the statute under which the consolidation in question was effected require the assumption of all obligations, those arising upon tort as well as those arising upon contract, but that the charter itself, following the language of the statute, imposed the payment of such obligations upon the consolidated company.

We find no error in the record, and the judgment is affirmed.

All the Justices concurring.