No. 37,503

PEARL J. SCHULZ, as Administratrix of the Estate of Julius F. Schulz, deceased, and PEARL J. SCHULZ, as Guardian of the Person and Estate of Frank Schulz, a minor, *Appellee*, v. CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY, and W. E. ROBERTS, AUSTIN BLOYD, JOHN MYERS and CHARLES SNOOK, *Appellants*.

(205 P. 2d 965)

Opinion filed May 7, 1949.

*Mark L. Bennett,* of Topeka, argued the cause, and *John E. DuMars, Clayton M. Davis,* both of Topeka, and *Fred Emery,* of Belleville, were with him on the briefs for the appellants.

*Charles A. Walsh,* of Concordia, argued the cause, and *Fred M. Swoyer,* of Belleville, was with him on the briefs for the appellee.

The opinion of the court was delivered by

PARKER, J.: This is an appeal by a railroad company from a judgment rendered against it for damages under the wrongful-death statute on a verdict and special findings returned by a jury.

The pleadings are not in issue. All that needs to be said regarding them is that the petition was sufficient in form and stated a cause of action under the statute while the answer contained a general denial and properly pleaded contributory negligence on the part of the decedent which was denied by a reply.

The facts essential to a proper understanding of the conditions and circumstances prevailing at the time the accident occurred will be stated in narrative form. Those in dispute or of particular significance in deciding the issues will receive more specific attention later in the opinion when occasion requires.

Plaintiff is the administratrix of the estate of the decedent hereinafter named and the guardian of his minor child. The principal defendant is a railroad company. All other defendants were its employees on the dates herein involved.

On the date of his death Julius F. Schulz, a man forty-eight years of age, with a wife and five children, one of whom was a minor, was an employee of the Belleville Ice Company, a partnership, whose business operations were carried on under the direction and control of Clarence E. Harber as part owner and manager.

The office of the ice plant is located directly south of the railroad tracks and premises of the defendant railroad company. Its back or north side fronts on such premises where there is an elevated dock or platform, ten feet in width and 200 feet in length, which runs east and west parallel with a railroad track known as the ice or scale track. The railroad's passenger and freight stations, its main line track, and several switch tracks, all running east and west, are located to the north of the dock and ice track. About 130 feet west of the icing dock there is a viaduct carrying city traffic over the main line track. Directly beneath the viaduct the ice track connects with the railroad's main line and other switch tracks.

Under an agreement between the railroad and the ice company the latter ices refrigerator cars containing perishable fruits· and vegetables as needed and required by placing ice in bunkers through openings provided in the top or roof of such cars. Several thousand cars annually are iced at the dock and the number employed in the icing operation depends upon the number of cars to be iced.

On the evening of April 27, 1946, the decedent Schulz, who was working night shift at that time, reported for work at the ice

plant at about 8:30 p. m. Prior to his arrival a through fast freight, running between Denver and Chicago, had arrived at Belleville. In two switching movements, the railroad company's switch crew had placed seven refrigerator cars from that train upon the scale track north of the dock where, pursuant to orders received from the railroad, they were being iced by employees of the ice plant. The ice dock was lighted under condition which made it possible for all who looked to see the dock itself and the top of all cars which were being iced in front thereof. The first four of such cars were standing in the light of the dock. The other three were to the east of the dock out of the light. When Schulz reported for duty he was instructed by the manager of the ice plant to check the numbers of the seven refrigerator cars, three of which had already been iced and were located as heretofore noted. In compliance with this order he descended from the ice dock platform, which was several feet higher than the refrigerator cars, to the top of such cars by means of a chute provided by his employer for that purpose and then began to take numbers off the top of the cars. In doing so he started with the west car, at the northwest corner of the dock and worked toward the east. Shortly after he started this checking operation the switch engine with a caboose fastened to the east end thereof backed onto the scale track from the west for the purpose of making a coupling with the seven cars involved in the icing operation. At or about the time he had reached the seventh refrigerator car, the one farthest to the east, a coupling was made with such cars and the switch foreman gave orders for the train to move. However, the brakes on some of the cars were set and the train, consisting of the engine, caboose and the seven cars, which had commenced to move was halted until those brakes could be released. It was then started up again and pulled in a westerly direction past the lighted dock and out past the switch under the viaduct where it was stopped and then backed east on another track and into the train from where the seven refrigerator cars originally came.

About 9:05 p. m. Schulz, who had either been unable to get off the refrigerator cars or had failed to do so at the time they were pulled from the ice dock, and had been carried away on such cars, was discovered at a point 180 feet west of the viaduct with both legs severed from his body. He died of the injuries thus sustained about thirty minutes later.

So much for the uncontroverted factual situation. We now turn to facts about which there is dispute. After a careful examination of the record they will be stated in substance and in accord with our conclusions as to the import of the evidence without any attempt to detail testimony of the witnesses. They relate: (1) To notice given by the railroad company, hereinafter in the interest of brevity referred to as the company, to Schulz's employer with respect to removing the refrigerator cars from the scene of the icing operation. (2) Information conveyed to or received by Schulz of the company's intention to move the refrigerator cars, hereinafter called the train, while he was still at work thereon. (3) His failure to get off the train before it started to move. (4) Conduct of the company and its employees both before and after movement of the train had commenced. (5) Schulz's action after the train had started to move. (6) Operation of the train at or about the point where Schulz's body was found and where he had received the fatal injuries resulting in his death.

With respect to the factual question herein above designated as 1, it appears that a few moments before the switch engine made its coupling Clarence E. Harber informed a member of the switch crew the icing operation would be through in two or three minutes. This witness, who testified for the plaintiff, stated he did not remember whether he gave the switch crew any directions to start the train, that it had started up and then had been stopped to release the brakes and that if anyone of the company's employees said anything about again starting movement of the train he did not remember it. Defendants in making their defense supplemented this evidence by testimony that after the train had made the coupling and stopped Mr. Harber advised the switch crew it was OK to take the refrigerator cars away.

As to number 2 plaintiff's same witness on direct examination testified that after the coupling had been made, while the train was stopped and the air was being released he told Schulz "to come on, that they were hooking into it." On cross-examination he admitted that prior to that time he had warned Schulz of the fact the engine was backing in to pick up the refrigerator cars and that his intention was to warn him in ample time for him to leave the cars before the engine came in and made the coupling. There is no evidence, in fact it is not even suggested, that Schulz received any warning of any kind from the company's employees.

On point 3 plaintiff's own testimony discloses that in response to the last mentioned warning Schulz replied "I want to get this other number." However, we observe, Harber testified with respect to this same warning "Q. All right, now, did he come then and— A. Well, he started right away then to come down a ways and we started to give him the chute but the train was in motion. Q. Before you could give him the chute the train had started, is that correct? A. Yes; it was already in motion." Plaintiff's evidence also discloses, by statements of this witness and other employees of the ice plant, that after the train had started to move and the cars were being pulled past the dock in front of the lights Schulz was seen running over the top of the cars to the west in an apparent attempt to get off at the ice dock and the last time he was seen he was on the third car from the caboose and had started to climb down the side of that car. It is also undisputed that when his body was found there was taken from his person a slip of paper on which the number of the last car to which he had referred in his statement to Harber did not appear.

Factual point 4 has been partially covered by what has been heretofore stated, particularly with respect to the conditions and circumstances under which the train's movement was started and completed. From the record it is clear that at least four switchmen were participating in the switching operation. Two of them, testifying in behalf of the defendants, definitely stated they could see the ice dock and the top of the refrigerator cars from where they stood at the time the train started its final movement and that although they looked they did not see Schulz on top of the cars as the train passed the dock. One of them, who gave his testimony by deposition, was not interrogated on that point. The other member of the switching crew did not testify. The testimony on this particular subject when considered in its entirety warrants the inference that all four switchmen could have seen a man on top of the refrigerator cars if he had been there under the conditions and circumstances related by the plaintiff's witnesses. There is no evidence susceptible of a construction that after the train stopped to release the brakes the switch crew made any inquiry whatsoever as to whether workmen were off the train.

Disputed facts with respect to point 5 have also been partially covered and what has been said need not be repeated. In addition it should be stated Harber testified that prior to the night in question he had warned all of his employees, including Schulz, that if

they happened to get caught on a car while a train was in movement they should sit down on the car. At another point in his testimony he stated he had warned them to get back from the end of the car or sit down. No witness testified as to Schulz's conduct and action after the refrigerator cars were pulled away from the lighted dock for the obvious reason that he could no longer be seen by anyone.

The evidence as to point 6 is highly conflicting. Defendants' witnesses all testified to the effect that from the time the train started to move from the ice dock until the refrigerator cars were placed in the fast freight from whence they came the switching operation was conducted in the ordinary and usual manner. However, it is to be noted that the engineer and foreman of the switch crew each admitted that on the night Schulz was killed the train was operated by straight air, *i. e.*, use of the brake on the engine only, instead of automatic air which would have controlled all of the cars in the train, and while they did not actually admit it inferentially conceded there was more opportunity for rough handling of a train, particularly with reference to the jerking and jamming of cars, when it was operated under those circumstances. On the other hand, three of the plaintiff's witnesses testified the train was moved out faster than usual that night and at least one of them stated that when it stopped on the west side of the switch under the viaduct it made lots of noise.

Two of the principal points relied on by appellants as grounds for a reversal of the judgment are that the trial court erred in overruling their demurrer to appellee's evidence and in overruling their motion for judgment notwithstanding the verdict. Except for one contention relating to the motion, to be presently mentioned, the grounds relied on for sustaining both the demurrer and the motion are identical and can be jointly considered.

It is first urged that appellee's evidence failed to establish the company's negligence. At the start of its argument on this point appellants fall into error by failing to recognize the duty owed Schulz under the prevailing conditions and circumstances. He was not a mere trespasser or licensee as they suggest but an invitee of the company. (*Folsom v. Chicago R. I. & P. Rly. Co.*, 157 Kan. 328, 139 P. 2d 822; *Degitz v. Railway Co.*, 97 Kan. 654, 660, 156 Pac. 743.) The duty of a railway company to a person in his situation is stated in section 1809 at pages 900 to 902, inclusive, of the second edition of volume 3 of Elliott on Railroads thus:

"Shippers and consignees of freight on railroad premises for the purpose of

loading and unloading cars are properly there and are not trespassers, or bare licensees, and the railroad company is bound to use reasonable care to avoid injuring them while so engaged. If such persons while so engaged, and without negligence on their own part other than that inattention to their own safety which an absorption in the duties in which they are engaged naturally produces, are hurt by the negligence of the railway company, they have an action for damages. It is the duty of switch crews with knowledge, or the means of knowledge that persons are loading or unloading cars, to warn them of an intention to switch cars over a track on which their car is placed. These persons do not assume the risk of injuries from this cause. The persons actually at work must be notified; it is not sufficient to notify their employers. . . ."

The rule just stated is quoted with approval and followed in *Linker v. Railroad Co.*, 82 Kan. 580, 584, 109 Pac. 678.

To the same effect is 2 Thompson, Commentaries on the Law of Negligence (2d ed.), § 1841.

In the instant case the uncontroverted testimony is that Schulz was still at work when the switch engine backed in and made its coupling with the refrigerator cars. There is testimony to the effect that he was still there before the train started its final movement, was seen by the ice plant employees, and could or should have been seen by the switching crew while he was running up the string of cars in the light of the dock and had reached the third car from the switch engine at the time the train started its final movement. Irrespective of what the duty of the company was toward him prior to that time it was required at that point to give him time to get off the train before orders were given for it to move. The fact the switchmen say they looked and did not see anyone on top of the cars is of little moment. If Schulz was there at the time they were bound to see what they could and should have seen. Therefore the evidence, to which we have just referred, if believed, was sufficient to establish negligence and, since its existence was a disputed factual issue, the trial court properly held the decision on its weight and effect was for the jury. The same holds true of the evidence, heretofore related, pertaining to the negligent operation of the train at or near the point where Schulz received the injuries resulting in his death.

Lack of time and space precludes reference to the multitude of decisions, most of which have been decided on their respective factual situations dealing with questions pertaining to when there is negligence in the operation of trains under conditions and circumstances somewhat similar to these here involved. For a few

which support the conclusion just announced and are illustrative of the legal principles and reasoning responsible for its pronouncement see *Central Railway Co. v. Duffey,* 116 Ga. 346, 42 S. E. 510; *Young v. Atlantic Coast Line R. Co.,* 165 S. C. 441, 163 S. E. 834; *St. Louis & S. F. R. Co. v. Cole,* 49 Okla. 1, 149 Pac. 872; *Howard v. Lewin Metals Corporation* (Mo.), 22 S. W. 2d 84; *Neal v. Curtis Co. Mfg. Co.,* 328 Mo. 389, 41 S. W. 2d 543; *Kelly v. Boston & Maine Railroad,* 319 Mass. 603, 66 N. E. 2d 807; *Ward v. New York Central Railroad,* 248 Mass. 115, 142 N. E. 751; *Walsh v. Terminal Railroad Ass'n of St. Louis,* 355 Mo. 377, 196 S. W. 2d 192.

While the next question urged—whether Schulz was guilty of contributory negligence as a matter of law—is not easy we have decided, that under all the facts and circumstances it must also be determined adversely to appellants' position. As an invitee he was, of course, required to exercise such care as the dangers of the conditions under which he was working would suggest to a man of ordinary prudence and caution. However, we have far more difficulty than appellants in concluding he was required to immediately start to leave the train when he was first warned by Harber that the switch engine was backing in to pick up cars. Schulz was an experienced employee, he had not finished his work, and he may have thought he had time to do so before the coupling was made or at least before the train started to pull the cars away. Whether he could have done so under ordinary circumstances is a matter of speculation which we need not decide. Be that as it may, there is evidence to the effect he did not complete his work, that the train moved out faster than usual on the night in question, and that when Harber told him to come on at the time the train crew was releasing the brakes he started right away to come down the top of the cars to the dock and the ice plant employees started to give him the chute in which to ascend thereto but were unable to do so because by that time the train had started and was already in motion. In such a situation, even though it be assumed failure to get off the train was the direct, legal or proximate cause of his fatal injuries later received, we are convinced the question whether he exercised the degree of care required of him at the time and in the particulars just referred to was a question of fact and not of law.

In connection with the foregoing contention appellants insist, that negligence *vel non* in failing to get off the cars, Schulz was nevertheless guilty of negligence as a matter of law in standing up on them

when the train started to move instead of sitting down as he had been instructed by his employer. On this point they entirely ignore the fact there was no testimony whatsoever as to what his position was at the time he was thrown from the train and sustained his injuries and the legal principle that under such conditions a man is presumed to have done everything possible to insure his own safety. Even so their position cannot be upheld. As we have heretofore indicated the record discloses sufficient evidence to sustain recovery against the appellants based on their own negligence. It also reveals testimony which warrants the conclusion Schulz was confronted with sudden, unexpected danger which well might have influenced his judgment and conduct. The rule in this jurisdiction is well established that in such a situation one who, by the negligent act of another, is placed in a position of danger which requires immediate and rapid action, without time to deliberate as to the better course to pursue, is not held to the strict accountability required of one situated under more favorable circumstances and is not guilty of contributory negligence as a matter of law if he does not exercise the greatest prudence or best judgment or choose the wisest or safest course in attempting to avoid the perils of the situation with which he is suddenly confronted (*Edgerton v. O'Neil,* 4 Kan. App. 73; *Railroad Co. v. Langley,* 70 Kan. 453, 78 Pac. 858; *Eaton v. Salyer,* 135 Kan. 411, 10 P. 2d 873).

For general statements supporting the rule heretofore stated and citations of authority from other jurisdictions in accord therewith see 38 Am. Jur. 874, 876, § 194; 45 C. J. 962, 1210, §§ 517, 866.

Appellants assert the trial court erred in giving instruction 13 which deals with the duties and responsibilities of a person when confronted with an emergency. We have examined that instruction and are satisfied it contains a fair statement of the pertinent law applicable when a situation of that character is disclosed by the record. Indeed, when their contentions on this point are analyzed it is obvious they are founded upon the erroneous premise no emergency existed rather than upon a claim principles of law pertinent thereto were incorrectly stated.

Instruction 14, dealing generally with the essential facts appellee was required to establish in order to entitle her to recover, is also assigned as error. The error relied on was founded upon the mistaken but bona fide belief this instruction contained certain material language appearing in copies submitted to counsel but which

was actually deleted by the trial court at the time it was submitted to the jury. Since argument of the cause counsel for appellants, with commendable candor, have advised us this claim of error may be disregarded. Hence, we give it no further consideration.

Another assignment of error relied on is that the answers to special questions 7, 9, 13 and 14 are not supported by the evidence. In connection with this claim we pause to point out a fact, not heretofore mentioned, that James McKinstry was the foreman of the company's switch crew and the man who actually gave the order for the movement of the train. These questions and answers read:

"7. State whether or not you find from the evidence Schulz had sufficient time to get off of said cars and get into a place of safety after he received warning or knew that said string of cars were to be moved. A. No.

.    .    .    .    .    .    .    .    .    .    .    .    .

"9. Do you find that the defendant, W. E. Roberts, was guilty of negligence, and, if so, then state what such act or acts of negligence were. A. Yes. Stopped too abrupt.

.    .    .    .    .    .    .    .    .    .    .    .    .

"13. Do you find that any other employee of the defendant railroad company, who was connected with the matter of switching and movement of the cars in question, was guilty of negligence, and, if so, state the name of such employee and of what such act or acts of negligence consisted. A. Yes. James McKinstry giving orders to move train without proper authority.

"14. If you find from the evidence that Julius F. Schulz was guilty of any act or acts of negligence which caused or directly contributed to his injuries and death, then state of what such acts of negligence consisted. A. No. As of Paragraph 13 of court instructions."

The answer to the claim last mentioned is to be found in what has been heretofore stated and held with respect to appellants' other contentions. Based on our conclusions with respect thereto we have little difficulty in concluding there was evidence to support each and all of the special findings. On the same basis we have no trouble in reaching the further conclusion the third ground of their motion for judgment *non obstante*, referred to early in this opinion, to the effect the special findings of the jury entitle them to judgment, was properly overruled.

Finally appellants complain of the refusal of the trial court to give numerous requested instructions. Many of these instructions were predicated upon their fallacious theory, which we pause to note permeates all contentions of error advanced by them on appellate review, the evidence failed to prove negligence on their part but did establish contributory negligence of Schulz as matter of law and were therefore properly refused. Some of them were proper

and could have been given in the form requested. As to them, when we turn to the trial court's instructions, we find their essential legal principles were submitted in substance if not in exact form. That, under our decisions, was a sufficient compliance with their request.

After a careful examination of the record and consideration of all grounds relied on for its reversal we fail to find anything which requires or justifies a reversal of the judgment. It is therefore affirmed.

THIELE, J. (dissenting): I dissent from that part of the syllabus pertaining to the company's negligence and the plaintiff's contributory negligence, and what is said in the opinion with respect thereto.

WEDELL and PRICE, JJ., concur in the foregoing dissent.