HUGHES, by guardian *ad litem,* Respondent, vs. CHICAGO, ST. PAUL, MINNEAPOLIS & OMAHA RAILWAY COMPANY, Appellant.

*May 10—June 10, 1904.*

*Railroads: Injury to traveler on street: Defective crossing: Duty of company: Notice of defect: Instructions to jury: Negligence of trainmen: Court and jury: Submission of issues: Evidence: Depositions of persons present in court: Attorneys: Improper arguments: Appeal: Exceptions.*

1. In an action against a railway company for injuries alleged to have been caused by reason of plaintiff's foot being caught between a rail and planking at a street crossing, so that he was held until an engine struck him, the evidence is *held* to sustain a finding by the jury that the crossing, at the time of the accident, was insufficient for public use.
2. A charge to the jury, in such case, that it was the duty of the defendant to maintain the crossing in a reasonably safe condition for public travel, including foot passengers as well as vehicles, and to exercise reasonable and ordinary care in keeping the same in repair and reasonably safe for public use, was not erroneous; nor was there error in refusing to charge to the contrary or more specifically.
3. It appearing that the insufficiency, if any, was the result of wear and use and was plainly to be seen by any person who went near it, it was not error to direct the jury that, if they found the insufficiency existed, they should further find that defendant had notice of it.
4. Whether defendant's employees on the train were negligent in not discovering plaintiff and stopping the train in time to prevent the accident, is *held* to have been a question for the jury and to have been fairly submitted to them

5. The question at issue whether plaintiff's foot was caught and held until injured, though not specifically submitted to the jury, is *held* to have been determined in the affirmative by their finding that the insufficiency of the crossing, and negligence of defendant's employees in not discovering plaintiff in time to prevent the accident, were the proximate causes of the injury—the charge of the court upon that subject being such that in so finding the jury necessarily found that the plaintiff's foot was caught and held as stated; and defendant, having requested the consideration of the question in that connection, cannot complain.

6. Depositions of mere employees of a corporation which is a party to the action, taken under sec. 4096, Stats. 1898, as amended by ch. 244, Laws of 1901, are not admissible in evidence against the objection of the corporation, when the deponents are present in court, subject to be called and examined as witnesses in the ordinary way.

7. For counsel to read to the jury and apply to the case in hand, extracts, purporting to be extracts, from the opinion of the supreme court in another case, and to contend that the jury ought not to be directed to disregard such argument and authority, was an abuse of privilege; and where the trial court sustained an objection to such reading and directed the jury to disregard it, exceptions to the reading and remarks of counsel were not necessary to bring the matter before this court for review.

APPEAL from a judgment of the circuit court for Douglas county: A. J. VINJE, Circuit Judge. *Reversed.*

This is an action to recover damages for personal injuries sustained by being struck by an engine of the defendant while crossing Ogden avenue in Superior. Issue being joined, and trial had, the jury returned a special verdict to the effect:

(1) The defendant's crossing at the time when and place where the plaintiff claims he was injured was insufficient for public use. (2) The defendant did have notice of such insufficiency, so that by the exercise of reasonable diligence it might have remedied it before plaintiff was injured. (3) The defendant was guilty of a want of ordinary care in not discovering the plaintiff and stopping the train in time to pre-

vent the accident. (4) *"Question 4.* If your answer to the first question is 'Yes,' and your answer to the third question is 'No,' then was such insufficiency of the crossing the proximate cause of plaintiff's injury?" No answer. *"Question 5.* If your answer to the first question is 'Yes,' and your answer to the third question is 'Yes,' then were such insufficiency of the crossing, and want of ordinary care on the part of the defendant in not discovering plaintiff in time to prevent the accident, the proximate cause of plaintiff's injury? *Answer.* Yes." (6) The plaintiff was not guilty of any want of ordinary care that contributed to produce his injury. (7) Two thousand dollars will compensate plaintiff for the damage he has sustained by reason of the injury complained of.

From the judgment entered upon that verdict in favor of the plaintiff for the amount stated, the defendant appeals.

It appears that at the place in question the defendant's main track ran east and west, crossing Tower avenue, Ogden avenue, and John avenue at right angles; that Tower avenue was the next street west of Ogden avenue, and that John avenue was the next street east of Ogden avenue; that the defendant's side track, which crosses Tower avenue a little north of the defendant's main track; gradually approaches the main track as it goes east on Tower avenue until it is brought in connection with the defendant's main track at or near the easterly line of Ogden avenue. It also appears that about 7 o'clock on the evening of July 18, 1902, the plaintiff, a boy fifteen years and five months of age, passed south over such tracks of the defendant on Ogden avenue; that soon after he turned and went north on Ogden avenue; that upon reaching the defendant's main track he claims his left foot became caught between the heel of the pilot and the planking of the crossing by the defendant's locomotive coming from the west, and he was injured, for which he brings this action.

For the appellant there were briefs by *Pierce Butler* and *S. L. Perrin,* and oral argument by *Mr. Perrin.*

For the respondent there was a brief by *W. P. Crawford* and *W. D. Dwyer,* and oral argument by *Mr. Dwyer*

CASSODAY, C. J.   1. The defendant claims that a verdict should have been directed in favor of the defendant on several grounds.   Among other things, it is claimed that the finding of the jury to the effect that the defendant's crossing was insufficient for public use at the time and place where the plaintiff claims to have been injured is not sustained by the evidence, but is contrary to the law and the evidence, and that the court should have changed the answer of the jury to the first question submitted from the affirmative to the negative.

After referring to the difficulty of describing the place where it is claimed that the plaintiff's foot became caught, the same counsel say, in effect, that the crossing was constructed by the laying of planks outside of and between the rails of this track; that on the outside of the rail of the main track the plank was brought into close contact with the rail, and was about the same height as the top thereof; that there was maintained at the crossing an alarm or warning bell, which was rung on the approach of trains, by electric connections; that in the center of the street (Ogden avenue), where the plaintiff claims his foot was caught, there was a joint between two rails; that, to operate the bell, it was necessary to insulate this joint; that this was done by means of a so-called Weber joint, which was two feet long; that on the inside of the rail of the main track, to furnish a flangeway for the passage of wheels of locomotives and cars, there was placed an inverted rail; that the rail of the track—stock rail—weighed eighty pounds to the yard; that the inverted rail was a sixty-pound rail, and was so placed that the ball or top thereof was placed against the inside of the web of the stock rail; that the upper side of the ball of the inverted rail was close against the bottom of the ball of the stock rail, and the bottom

edge of the base of the inverted rail rested upon boards lying upon the tops of the ties, and the top edge of the base of the inverted rail was thereby brought practically even with the top of the plank of the crossing, and very slightly below the top surface of the ball of the stock rail; that the end of the inverted rails extended to within one foot of the ends of the Weber joint; that it is claimed by the plaintiff that he was caught at the space between the east end of the Weber joint and the west end of the east inverted rail; that in the spaces, each of which was a foot long, between the inverted rails and the ends of the Weber joint, there had been fitted blocks extending down to the base of the stock rail, and up as high as the top of the Weber joint at one end, and a little higher than the web of the inverted rail at the other end, of the block, and it is at the place where one of these blocks (the most easterly) was placed that the plaintiff claims that his foot became caught and fastened.

The evidence is voluminous. No useful purpose could be served by giving it in detail. There is certainly evidence tending to prove that the plaintiff's foot got caught as he claims. He testified to the effect that as he was going north across Ogden avenue his right foot got caught pretty near the middle of the street; that he had on shoes in a worn-out condition, with loose soles; that there was a hole there on the track, between the rail and the plank, three feet long and from three to five inches wide and four or five inches deep; that he did not notice the hole before he got stuck there, nor afterwards; that when he got his foot caught there the train was standing still on the same track, between sixty-five and seventy feet west from him; that the plank was splintered off—clear off (not clear down to the bottom, but clear down as low as the top of the Weber joint, or a little higher); that he was not caught against the inverted rail by the side of his foot; that the inverted rail might have had something to do with catching him; that he did not know whether it did or

not, but that it was there. A witness for the plaintiff testi-
fied, among other things, to the effect that the surface of the
street next to the south rail was straight, or rather smooth;
that the condition of the surface north of the south rail, east
of the Weber joint, was that there was a hole there; that he
did not measure it, but should say that it was probably twelve
or fifteen inches long and two and one-half or three inches
wide, and, from the top of the rail that the train runs on, was
down about two or two and one-half inches; that at the hole
the plank was lower than the top of the rail; that he thought
it was worn some—more at the hole than it was where the
Weber joint protected the edge of the plank; that possibly it
was worn off about an inch. Another witness for the plaintiff,
and a boy about his age, who was with him at the time, tes-
tified to the effect that he saw the plaintiff when he started
to go across the Omaha tracks; that he at first went south,
and then, when he got around over there, he went to turn
round, down towards the center of the street, and when he
got there he turned around and looked for the other boys, and
his foot slipped down, and got down between the plank and
rail, and got caught there; that at that time the train was
standing still, west of Ogden avenue; that after the plaintiff
was caught, and before the train struck him, he was waving
his hand and trying to get out; that he was facing west when
he got caught; that the witness saw the train start up, and
come along and strike the plaintiff, and he rolled over, and
the train dragged him about eight feet; that the plaintiff got
up and tried to walk, and fell down; that the witness was on
the north side of the track, and he saw the man in the cab on
the right-hand side, as he looked west, looking toward Tower
avenue; that, after the plaintiff was struck, he noticed the
place where he was caught—a kind of hole between the rail
and plank on the north side of the rail, near the center of
the street.

Without further reference to the mass of evidence bearing

upon the question, we must hold that the evidence is sufficient to sustain the finding of the jury above mentioned. Nor do we think there was any reversible error in charging the jury upon that question to the effect that it was the duty of the defendant to maintain its crossing at the place in question in a reasonably safe condition for public travel, including foot passengers as well as vehicles, and to exercise reasonable and ordinary care in keeping the same in a state of repair and reasonably safe for public use. Nor was there any reversible error in refusing to charge to the contrary or more specifically.

2. The answer to the second question, directed by the court, was necessarily conditioned upon the answer of the jury to the first question submitted, and was to the effect that if they found the defendant's crossing, at the time and place in question, insufficient for public use, then they should find that the defendant had "notice of such insufficiency, so that by the exercise of reasonable diligence it might have remedied it before plaintiff was injured." In other words, the jury were thereby instructed that, if they so found the defendant's crossing insufficient, then, in law, the defendant had due notice of such insufficiency. In view of the fact that it appears from the undisputed evidence that such insufficiency, if any, was the result of the wear and use of the structure in question, and that such structure was plain to be seen by any person who went near it, we cannot say that there was any reversible error in the direction so given.

3. By the third question submitted, the jury were called upon to determine whether the defendant was guilty of a want of ordinary care in not discovering the plaintiff and stopping the train in time to prevent the accident. Their answer was in the affirmative. Counsel claim that such finding is not sustained by the evidence, but is contrary to the evidence, and that it was error for the court not to change the

answer of the jury from the affirmative to the negative. The question was properly for the jury. It was fairly submitted to them in language as favorable as the defendant had the right to expect. Among other things, the jury were instructed upon that question that:

"It was the duty of the defendant, as its train approached Ogden avenue, to keep a careful lookout ahead, or in the direction in which the train was moving. But the failure of the persons in charge of defendant's train to constantly look ahead was not necessarily negligence or want of ordinary care. The failure of such persons to have seen the plaintiff prior to the time he was injured by the engine does not necessarily indicate that defendant was negligent or guilty of any want of ordinary care."

And again:

"Before you are justified in finding the defendant guilty of a want of ordinary care in not keeping a careful lookout, you must find that the trainmen failed to exercise that degree of care which men of ordinary intelligence and prudence, engaged in the same employment, would have exercised under the same or similar circumstances."

Other instructions were given in the same line. The instructions given substantially covered the question, and there was no reversible error in refusing to give other instructions on that question.

4. It is claimed that the question at issue, as to whether the plaintiff's foot became caught and fastened and held until injured, was not determined by the verdict. The amended complaint alleged, in effect, that the plaintiff's foot became caught and fastened in and between an open space existing between one of the rails and a defective, broken, and splintered plank on the side thereof, so that he was unable to immediately extricate the same or get across the railroad track, and that while in that condition the defendant's engine was suddenly and unnecessarily and negligently, and without warning,

started and propelled over, upon, and across Ogden avenue,. striking the plaintiff's foot with the pilot and the wheels of .the engine, causing the injuries complained of. The answer put such allegations in issue by denials. This court has repeatedly held that it is the duty of the trial court to submit to the jury the particular physical facts directly put in issue by the pleadings, when properly requested to do so. *Lee v. C., St. P., M. & O. R. Co.* 101 Wis. 352, 77 N. W. 714; *Jenewein v. Irving, ante,* p. 228, 99 N. W. 346, 347. But. the court has often held that the form of such special verdict is largely in the discretion of the trial court. Id. The question recurs whether the fact so put in issue was determined by the verdict of the jury. There is no claim that it was. specifically submitted to the jury. But it is contended that the fourth and fifth questions submitted to the jury, and the charge of the court upon those questions, required the jury necessarily to determine whether the plaintiff's foot became so caught, fastened, and held until struck by the engine. Those questions are given in full in the foregoing statement. By the fourth question, the jury were required, in case they found the defendant's crossing to be insufficient and that the defendant was not guilty of negligence for failure to keep a lookout, to determine whether such insufficiency of itself was the proximate cause of the plaintiff's injury. After defining "proximate cause," the court charged the jury, under that question, that:

"Before you can find that the insufficiency of the crossing was the proximate cause of plaintiff's injury, you must, under the evidence in the case, find that there was some depression or hole at the place where plaintiff claims he was injured; that his foot was caught and held fast in such depression or hole until he was struck by defendant's train; and you must further find that such depression or hole was of such a character that a person of ordinary intelligence and prudence ought, by an inspection before the accident, reasonably to have foreseen might probably result in a personal injury to

another.   It is not enough that the injury was the natural result of the insufficiency of the crossing, but it must also have been a probable result—a result likely to follow from the condition of the crossing."

These instructions were substantially in the language requested by counsel for the defendant.   But the jury did not answer the fourth question so submitted, for the simple reason that by the terms of the question they were relieved from doing so by finding, in answer to the third question, that the defendant was guilty of negligence by failing to keep a lookout.   But by the answer to the fifth question the jury necessarily found that such insufficiency of the crossing and such failure to keep a lookout were together the proximate cause of the plaintiff's injury.   After explaining the difference between this question and the fourth question, the court instructed the jury upon this question that:

"What is meant by the term 'proximate cause,' and what you must find in order to declare a condition, act, or failure to act, resulting from a want of ordinary care, the proximate cause of an injury, you have just been instructed under the previous question; *and you will consider such instruction repeated here."*

In obedience to such instructions, the jury necessarily found, in answer to the fifth question, as essential to the proximate cause mentioned, that the plaintiff's foot became so caught, fastened, and held until struck by the engine.   It may be that the question might have been more appropriately considered and determined under the question submitted as to contributory negligence.   But the defendant, having requested its consideration under the other questions mentioned, is in no position to complain on that ground.   Certainly the question was susceptible of being considered under the broad scope of the question of proximate cause.   *Jenewein v. Irving, ante,* p. 228, 99 N. W. 346, 348.

5. November 29, 1902, under sec. 4096, Stats. 1898, the

plaintiff examined J. P. Cleary, who was the conductor of the train in question at the time of the accident, and also Robert G. Wilson, who was the engineer on the locomotive in question at the time of the accident. At the time of the trial, in June, 1903, and when the plaintiff offered in evidence the ·depositions of those two witnesses so taken under sec. 4096, the defendant objected to the same on the ground that both ·of such witnesses were then and there present in the court; and it appears in the record that they were both, in fact, then and there present in the courtroom. The court over-ruled the objection, and the defendant excepted. This court held twenty years ago, and repeatedly since, that the section of the statute under which these depositions were taken "was intended as a substitute for a bill of discovery," but that "the examination of a party under" that section was "not lim-ited to the cases in which a discovery might have been had in equity." *Cleveland v. Burnham,* 60 Wis. 16, 17 N. W. 126, 18 N. W. 190; *Kelly v. C. & N. W. R. Co.* 60 Wis. 480, 19 N. W. 521; *Whereatt v. Ellis,* 65 Wis. 639, 27 N. W. 630, 28 N. W. 333; *Meier v. Paulus,* 70 Wis. 165, 170, 171, 35 N. W. 301; *Frawley v. Cosgrove,* 83 Wis. 441, 53 N. W. 689; *Schmidt v. Menasha W. W. Co.* 92 Wis. 529, 66 N. W. 695. In *Meier v. Paulus, supra,* Mr. Justice TAYLOR said:

"The very object of the old bill of discovery was to procure evidence against the opposite party, to be used on the trial of an action; and it was never held that the answer of the party to the bill could not be used against him if he appeared at the trial of the action in aid of which it was taken, and was willing to submit himself to an examination in such action. . . . The examination of a party is in the nature of an ad-mission, so far as his answers are material to the issues in the action, and such admissions are always admitted as original evidence against him."

Subsequently to the Revision of 1878 the scope of the sec-tion was enlarged so that, "in case a private corporation be

a party, the examination of the president, secretary or other principal officer or general managing agent of such corporation" might be taken by deposition at the instance of the adverse party.  Sec. 4096, Stats. 1898.  By a recent statute the section has, in terms, been extended to the "agent or employee" of such corporation or of such adverse party.  Ch. 244, Laws of 1901.  Neither of the witnesses in question was an officer of the defendant, nor in any sense a party to this action.  On the contrary, each was a mere employee in the capacity mentioned.  Assuming that their depositions were rightfully taken under the statute cited, the question recurs whether it was error to allow the same to be read in evidence on the trial against the objection of the defendant, when both witnesses were then and there present in court, subject to be called and examined as witnesses in the ordinary way.

Certainly there is no adjudication of this court justifying such admission under the circumstances mentioned.  The cases cited are to the effect that such "deposition of a party" so taken "is admissible on the trial as original evidence against him, although he is present at the trial," on the ground that such "examination of a party is in the nature of an admission so far as his answers are material to the issues in the action, and such admissions are always admitted as original evidence against him."  *Meier v. Paulus, supra.*  At the time of Blackstone the want of power to examine witnesses abroad was troublesome to courts of law, but he said it might "be done indirectly at any time, through the channel of a court of equity, but that such practice had never been directly adopted as the rule of a court of law."  3 Bl. Comm. 383.  Mr. Greenleaf discusses at length the question of taking the testimony of absent witnesses by depositions, and among other things says, in effect, that "the court of chancery has always freely exercised this power" of taking deposi-

tions in such cases; that the inconvenience to courts of law was remedied by statutes in England and this country; and finally concludes that:

"Depositions thus taken may be used at the trial by either party, whether the witness was or was not cross-examined, *if it shall appear,* to the satisfaction of the court, that the witnesses are then dead, or gone out of the United States, or more than a hundred miles from the place of trial, or that by reason of age, sickness, bodily infirmity, or imprisonment, they are unable to travel and appear at court." 1 Greenl. Ev. §§ 320–322.

He also says, in effect, that the statutes giving such right to take testimony by depositions, "being in derogation of the common law," must be strictly construed. 1 Greenl. Ev. § 323. To the same effect, 9 Am. & Eng. Ency. of Law (2d ed.) 298–300. Mr. Weeks, in his work on the Law of Depositions, gives similar views, and, among other things, says that "depositions are a species of evidence of a secondary character, admissible where the *viva voce* testimony or examination of the deponent is not attainable." §§ 4–6. Such was the common law when our constitution was adopted, and that declares that "the testimony in causes in equity shall be taken *in like manner as in cases at law,* and the office of master in chancery is hereby prohibited." Sec. 19, art. VII, Const. This provision seems to recognize the rule of the common law for the taking of testimony "in cases at law," and to require that the "testimony in causes in equity shall be *taken in like manner as in cases at law.*" The question was not squarely involved in *Noonan v. Orton,* 5 Wis. 60, 61, but the court there said that:

"We have no doubt that each party to a suit in chancery is, under our constitution, entitled to have his witnesses examined in open court, subject of course to the occasional exceptions provided for in cases at law. He may perhaps be entitled, if he demands it, to have the witnesses of the adverse party so examined, subject to the like occasional exceptions."

Such expressions were fully sanctioned in the later case of *Brown v. Runals,* 14 Wis. 693, where it was held that, under the constitutional clause in question:

"A party to an action such as was formerly denominated equitable is entitled to have the testimony in the case taken in open court, subject to the same exceptions as are allowed by law in actions such as were formerly denominated legal."

That was an action in equity, and it was reversed because it was referred to take the testimony against the objection of the defendant. After referring to the clear and terse language of the provision of the constitution in question, it is said in the opinion of the court:

"How is testimony taken in actions at law? With few exceptions, it is taken by the examination of witnesses on the trial before the court and jury. This is the almost universal practice of taking testimony in common-law cases. And the advantages of this method of investigating facts, where the witnesses are orally examined, and where their appearance, manner, and conduct in giving their testimony can be seen by the court and jury, are too obvious to need comment. . . . It was the benefit of this system of taking testimony which the framers of the constitution intended to secure to the parties in equity cases." Page 698.

That opinion was reaffirmed a few months afterwards, and it was held that an act of the legislature requiring all testimony in a certain class of equity cases to be taken before a referee was void, among other reasons, because it deprived the party of his constitutional right to have his witnesses examined in open court. *Oatman v. Bond,* 15 Wis. 20, 27. We must hold that it was error to allow the depositions to be read against the objections of the defendant.

6. It appears that, in arguing the case to the jury, counsel for the plaintiff read a portion of the opinion of this court in *Valin v. M. & N. R. Co.* 82 Wis. 1, 51 N. W. 1084, changing the same so as "to correspond with the facts in this case." He was then told by the court that the reading of such ex-

tracts was entirely improper.     Some controversy was then
had as to just what was read from the opinion, and the coun-
sel making the statement thereupon withdrew the same.
Counsel for the defendant then requested the court to advise
the jury to disregard such statement.     Thereupon the follow-
ing statements were made—partly by one counsel for the
plaintiff, and partly by the other:

"It don't seem to me it is right to direct the jury to disre-
gard that which is the law.     It does not seem to me that the
court ought to direct the jury to disregard that authority.     If
I happen to make an argument which is in the language of,
or in the same line of, the judges of the supreme court, I
don't think I ought to be cross-examined as to where I got it."

In response to such statements, the court said:

"I am rather surprised at counsel for plaintiff; both of
them taking this position upon a question which has been
ruled upon so often by our supreme court as to be a matter
of common knowledge."

Certainly counsel for the plaintiff abused their privilege
in reading from the opinion of this court, and making the
statements which followed.     No attempt is made to justify
such conduct.     The claim is that such "arguments" of coun-
sel were not excepted to by counsel for the defendant.     Ex-
ceptions are supposed to be taken to the rulings of the court
upon objections made by counsel.     Here the rulings of the
court as to those matters were in favor of the defendant.
The abuse of privilege consisted in persistently overriding
the rulings of the court.     In the way the question is pre-
sented, and if this were the only ground of reversal, we
might not be inclined to disturb the judgment, but we trust
counsel will hereafter refrain from such conduct.

Other questions are discussed, but none of them seem to
be of sufficient importance to call for the consideration of
this court.

*By the Court.*—The judgment of the circuit court is re-
versed, and the cause is remanded for a new trial.