·JOHNSON, by guardian *ad litem,* Respondent, vs. ST. PAUL & WESTERN COAL COMPANY, Appellant.

*December 12, 1905—January 9, 1906.*

*Master and servant: Injury to servant: Evidence:* Res gestæ: *Court and jury: Negligence: Contributory negligence: Special verdict: Incompetency of fellow-servant: Notice to employer: Instructions to jury: Discovery: Examination of officer of corporation: Damages.*

1. An exclamation by one present when a boy fell through the hatch of a vessel, made at the place of and almost immediately after the accident, that "the hook hit him" was a part of the *res gestæ* of the accident.

2. It was a question for the jury, upon the evidence in this case, whether plaintiff, upon the deck of a vessel, was struck by a· swinging sheave and hook used in hoisting coal from the hold; and the evidence was ·sufficient to sustain a finding by the jury that the hoister was negligent in starting to raise the hook with a jerk which set it to swinging violently.

3. Plaintiff, whose duty it was to steady the buckets of coal as they were hoisted through the hatches, could not be said, as matter of law, upon the evidence, to have assumed the risk of the empty sheave and hook being raised through the hatch with a jerk or with great rapidity contrary to custom, nor· to have been guilty of contributory negligence in failing to remain, ·after the whistle blew for the men to quit work, to watch the empty hook until it swung clear of the deck and to steady it if swinging.

4. In an action for injuries to a servant, a negative answer in the special verdict to a general question covering contributory negligence sufficiently negatived assumption of risk; and the failure to submit a separate question as to assumption of risk. was not error in the absence of any request therefor or for an instruction specifically upon that point.

5. Evidence showing, among other things, specific instances of carelessness on the part of the hoister, who managed the apparatus: for raising coal from the hold of a vessel, and also his habits of carelessness and his reputation in that regard, is *held* to sustain a finding that he was incompetent to perform such duties.

6. Notice of the incompetency of an employee to a foreman who had supervision of the work in which such employee and others. were engaged and had power to discharge in case of incompetency, was notice to the employer.

7. A requested instruction touching the general question of the liability of the defendant and not applicable to any of the questions of fact submitted by a special verdict, cannot properly be given to the jury.

8. An employer need not have had actual knowledge that a servant had become incompetent since his employment in order to render him liable to another servant for injuries caused by negligence of the incompetent one. It is sufficient if, in the exercise of reasonable care, the employer should have learned of such incompetency.

9. In an action for injuries to a servant through negligence of a fellow-servant, an instruction that "ordinary care in such a case is such care as the great mass of mankind would have exercised under the same circumstances" was not erroneous because of the omission of the words "engaged in a similar employment."

10. Where a private corporation is a party, the examination of a principal officer thereof (in this case the superintendent of the dock of a coal company) under sec. 4096, Stats. 1898, as amended by ch. 244, Laws of 1901, is in effect the examination of the corporation and is admissible against it as original evidence in the nature of an admission, even though the officer examined is present in court. *Hughes v. C., St. P., M. & O. R. Co.* 122 Wis. 258, distinguished.

11. An award of $3,000 damages to a boy who, through defendant's negligence, fell nearly thirty feet into the hold of a vessel and was still suffering therefrom at the time of the trial more than three months later, the permanency of his disabilities being a. question in dispute by the experts, is *held* not excessive.

APPEAL from a judgment of the superior court of Douglas county: CHARLES SMITH, Judge. *Affirmed.*

This is an action to recover damages for personal injuries suffered by the plaintiff July 16, 1904. The defendant was and is a corporation operating a large coal dock at the city of Superior, where coal is unloaded from vessels by machinery and loaded into cars. On the date aforesaid the plaintiff, a boy then sixteen years of age, was employed by the defendant as a hatch tender, and was in some manner precipitated through one of the open hatches of a vessel then being unloaded at the dock and received serious injuries. The plaintiff's claim is that he was struck by a heavy sheave and hook used to lower coal buckets into the vessel, and that he was so struck by reason of the negligence of an incompetent employee of the defendant called a hoister, who was operating the sheave and hook, and that the defendant knew, or ought to have known, of such incompetence.

The evidence showed that upon the defendant's coal dock there were maintained at the time of the accident eight unloading rigs or derricks, which were used in removing coal from vessels lying at the dock, by machinery operated by steam power; that these rigs are timber structures of considerable height, located along the edge or face of the dock, and placed upon wheels resting upon tracks running the full length of the dock, so that they can be moved laterally to the exact point desired for unloading coal from vessels; that each rig has an engine room in the lower part, above which is a small hoisting house, where the hoister stands and operates two levers controlling the hoisting apparatus; that on the right of the hoisting house is a bin or hopper in which the coal is dumped as it is brought up from the boat, and passes into small cars below and back of this bin, and on the same level is a room in which the hoisting drums and friction wheels, which are operated by the hoister's levers, are located; that about twenty feet above the platform upon which the hoisting house

is placed there is a boom thirty feet in length, extending from the rig outward and over the boat to be unloaded, upon the top of which boom are rails, upon which rails a small four-wheeled iron carriage is placed which runs from the rig out to the end of the boom and back into the rig and carries two sheaves for the wire rope or hoisting line to pass over; that at the end of the boom is a small sheave for the rope, which is attached to the outer end of the carriage, to pass over, which rope is called the carriage line, and passes back into the ma- chinery house and around a drum, the other end being at- tached to the inner end of the carriage, so that the hoister may apply, by his lever, a friction wheel to the drum, and as the carriage line winds or unwinds the carriage moves in or out upon the boom; that the hoisting line passes over one of the sheaves in the carriage and then down to the hoisting hook and sheave, and thence back to and through the carriage again to another hoisting drum, to which it is attached, which drum is operated also by the hoister by means of a friction wheel, and as the hoisting line is wound up or unwound upon the drum the hook and sheave is either raised or lowered into the vessel below; that the hoisting hook and sheave, which is thus lowered into the vessel, is a heavy apparatus, some two and one-half feet in length, and upon it are fastened coal buckets; that the hoister, standing in the hoisting house, is able to see the vessel and hatchway below through windows in the house, and can see the coal bucket as it descends until it gets down into the hold of the boat; that the hoister operates the ma- chinery by the use of the two levers, the left-hand lever con- trolling the carriage line and the right-hand lever controlling the hoisting line, both of which lines are wound and unwound upon the drums, which drums are set in motion by the appli- cation of friction wheels controlled by the levers; that the coal bucket is lowered into the hold of the boat through the hatch by means of the carriage carrying the bucket out on the boom to the lowering point, and that the hatch tender is stationed on

the deck of the vessel by the side of the open hatch, and gives signals to the hoister when to lower the bucket into the hold of the vessel and when to raise the bucket or hook from the hold, accordingly as he sees that everything is clear in the hold; that in the hold are stationed six coal heavers, working in sets of two, and that three buckets are used to keep the rig in active operation; that as soon as an empty bucket is lowered the men to whom it belongs seize it and carry it away from the center of the hatch to the side to fill it, and then take off the hook, and the men that have a filled bucket attach the hook to their bucket, and the hatch tender gives the signal to the hoister to start the bucket, and as it swings up from the hold it is steadied, first by the coal heavers and then by the hatch tender, who has an iron hook for that purpose, so that it may rise without swinging until it reaches the carriage, which in the meantime has been started toward the bin by the hoister; that as the bucket reaches a point over the bin the bail strikes an automatic dumper, causing the bucket to be dumped into the bin.

The evidence further shows that one Mertes was acting as hoister upon the rig in question on the day of the accident, and that the plaintiff was acting as hatch tender at one of the hatches upon the steamer Hoyt, which was then unloading coal at the dock; that the deck of the boat at the time of the accident was about fifteen feet above the dock floor, and that there was a ladder at the stern of the boat, used to ascend or descend to and from the dock and boat; that the boat in question had some twenty hatches, each twenty-eight feet long transversely with the boat, eight feet wide, and forty-two inches apart, and each surrounded by coamings a foot or more in height; that the hatch through which the rig was operating was hatch No. 11, and that the plaintiff was stationed at the side of the hatch and between the same and hatch No. 12; that the rig had been in operation removing coal from this hatch all the afternoon upon the day of the accident, and that

Johnson v. St. Paul & Western Coal Co. 126 Wis. 492.

the whistle blew for stopping work at 6:45 p. m.; that just at this time an empty bucket was being lowered into the hatch, and as it reached the coal heavers the hatch tender gave notice to them that the whistle had blown, and the coal heavers disengaged the hook from the bucket and it started to swing; that the plaintiff, when he saw that the hook was disengaged and started to swing, gave the hoister, Mertes, the signal to raise the hook, and turned at once to pick up the box upon which he had been sitting and his guide hook, to leave his work. The plaintiff testifies that while he was picking up his box his side was toward the hatch, and he saw something black against his cheek, and that was the last that he remembered. It is undisputed that he fell into hatch No. 12 with his box and hook, and struck upon the bottom of the boat, a distance of some twenty-seven feet, and suffered severe injuries.

The jury rendered a special verdict as follows:

"(1) Was the plaintiff, *Einer Johnson,* injured on July 6, 1904, while in the employ of the defendant, by being struck by the sustaining hook or block, causing him to fall through a hatch down into the hold of the steamer Hoyt, which was then being unloaded at the dock of the defendant located at Superior, Wisconsin? *A.* Yes.

"If you answer question 1 'Yes,' then answer question 2 and the other questions.

"(2) Did the hoister, Mertes, exercise ordinary care in raising the block and sustaining hook out of the hold of the vessel at the time the plaintiff was struck? *A.* No.

"(3) Was the hoister, Mertes, a competent man to perform the duties of hoister? *A.* No.

"(4) Did the defendant, prior to the injury to plaintiff, have knowledge that Mertes was an incompetent hoister? *A.* Yes.

"(5) Was the incompetency of the hoister, Mertes, the proximate cause of the injury to plaintiff? *A.* Yes.

"(6) Was the plaintiff, *Einer Johnson,* guilty of any want of ordinary care that contributed to the injury? *A.* No.

"(7) If the plaintiff should recover in this case, at what amount do you assess his damages? *A.* $4,000."

The defendant moved to strike out and change certain answers in the special verdict, and for judgment upon the verdict; also for judgment notwithstanding the verdict; also for new trial—all of which motions were overruled, except that a new trial was granted on the ground of excessive damages, unless the plaintiff should remit $1,000 from the verdict, in which case a new trial was denied. The plaintiff elected to make the remission, and judgment was entered for $3,000 damages and costs, and the defendant appeals.

For the appellant there was a brief by *H. H. Grace,* attorney, and *C. O. Hunter,* of counsel, and oral argument by *Mr. Grace.*

*Victor Linley,* for the respondent.

WINSLOW, J. The errors claimed by the appellant will be briefly considered.

1. It is contended that there is no sufficient proof to show that the hook and sheave hit the plaintiff, but that it is conclusively shown that the hook and sheave were not elevated above the deck. It is true there was evidence from a number of witnesses that the hook was not raised above the deck at the close of work on the night of the accident, but remained suspended a foot or more below the deck all night. There is, however, the positive evidence of one witness, a boy nineteen years of age, who testifies that he was standing on the deck of the boat, about twenty-five feet from the plaintiff, and was looking towards him at the time the whistle blew; that he saw the hook and block come out of the hatch quicker than was usual when the bucket was on, and swinging lengthwise of the boat toward the plaintiff; that he saw the plaintiff stoop to pick up his box, and that he just straightened up and then fell over into the next hatch. Another witness, who was at work in the hold pushing buckets under another hatch at the time, from twenty to twenty-five feet distant from the place where the boy fell, testifies that he saw the boy fall, and went to him

as soon as he fell; that he struck on his hip first, and then on his back; that witness then started up the ladder and holloed to the foreman to telephone for a doctor, and went back and heard some one say, "The hook hit him." This exclamation was clearly a part of the *res gestæ* of the accident. The plaintiff testified that he turned and picked up his box and was just straightening himself up when he saw something black right against his cheek, and that was the last he remembered till he regained consciousness for a moment in the hold after his fall. In addition to this it was shown that the plaintiff's right cheek was swelled and discolored as though it had been hit by something, and that the swelling was visible for two or more weeks. In view of the fact that there was nothing else swinging which could have hit the plaintiff, we regard this evidence as entirely sufficient to carry the question to the jury.

2. It is claimed that there was no proof that Mertes, the hoister, was guilty of any negligence. The negligence claimed by the plaintiff is that the hoister started the hook and block with a jerk, and very rapidly, thus causing it to swing violently, when the custom was to raise the hook, when empty, more slowly than when it was loaded. The evidence tended to show that it was entirely possible for the hoister to regulate, within certain limits, the speed with which the hook or the hook and bucket came up. While it was shown that the power shaft always ran at substantially the same rate of speed, it also appeared that the power was communicated to the drums by friction wheels, and that the hoister could regulate the application of the friction by means of his levers, so that the drums would revolve at a moderate rate of speed or at a greater rate, as he chose, and could start the hook gently or with a jerk. The evidence tended also to show that when the hoister received the signal to raise the hook at the time in question he started more rapidly than was usual with an empty hook, and gave it a jerk which set it swinging violently,

and that as it was coming up it struck the iron at the side of the hatch, thus increasing the swinging motion.   Mertes himself testified as follows:

"When he [plaintiff] hollered of course he picked up his box and went away, so I paid no more attention to him.   So I just raised up out of my position, and I ketched the lever with both hands, and this line had the hook on it.   They had thrown the hook, and the hook was swinging, and she came up swinging in that position; but I didn't stop.   She struck under the steel, and the hook jumped up.   I kept on going just the same.   I didn't stop till I seen the man come running.   He stopped me."

Comment on this seems unnecessary.   It affords ample ground for a finding that the hook was raised with negligent speed and swinging violently.

3. Again, it is contended that the plaintiff assumed the risk as matter of law, or was at least guilty of contributory negligence, because he did not watch the hook and steady it with his guide hook until it came above the deck, as it is claimed his duty was to do.   Upon the first point it is enough to say that there was sufficient evidence tending to show that it was customary to raise the empty hook at moderate speed, and there was practically no evidence that the plaintiff had any reason to expect that Mertes would raise it with a jerk or with great rapidity at the time in question.   It cannot be said as matter of law that the plaintiff assumed a risk of which he was uninformed and which he had no reason to expect.   Upon the second point it is true that there was considerable evidence to the effect that it was the plaintiff's duty to remain after the whistle blew and watch the hook until it swung clear of the deck, and steady it if swinging; but there was also some evidence to the contrary, and there was no evidence that the plaintiff had ever been told that such was his duty, while, on the contrary, he testified directly that he had never been so informed.   We perceive no other ground upon which it could possibly be claimed that plaintiff was guilty of contributory negligence as matter of law.

In this connection it is said that it was error not to submit the question of assumption of risk to the jury by separate question in the special verdict.   This court has held that assumption of risk is a form of contributory negligence; hence a negative answer to the general question covering contributory negligence logically includes also assumption of risk, in the absence of a special question as to that special phase of contributory negligence.   *Hennesey v. C. & N. W. R. Co.* 99 Wis. 109, 74 N. W. 554; *Dugal v. Chippewa Falls,* 101 Wis. 533, 77 N. W. 878.   No special question was asked, nor instruction presented, on the question of assumption of risk; hence no error can be predicated upon the failure of the court to submit a separate question covering it.

4.  Some complaint is made in appellant's brief of the unsatisfactory character of the evidence relied on to show that Mertes was an incompetent and careless hoister; but, as no error is assigned upon any of the rulings admitting such evidence, we are relieved from considering the correctness of the rulings.    The broad claim is made, however, that the evidence was insufficient to prove incompetency.   The testimony on this point was considerable in volume.   It consisted of testimony of various co-laborers to the effect that Mertes frequently jerked the buckets violently; that he would drop the bucket down till it struck hard on the floor of the boat; that at times he ran the carriage off the track; that he dropped coal more than other hoisters by jerking the buckets; that he smoked while on duty, which was against the rules; that he had the reputation of being a careless hoister; and that when the men swore at him on account of his carelessness in handling buckets he laughed at them.   There was proof not only of specific instances of carelessness, but also of habits of carelessness and of reputation.   Without attempting to state the testimony in detail, it must be sufficient to say that it seems amply sufficient to warrant the finding of the jury on that point.   There was also much evidence that his negligent and careless habits were known to the foreman of the dock, who

had supervision of the work of the hoisters and other employees, with power to discharge in case of incompetency. Notice of incompetency to such an employee is notice to the principal. *Baltimore & O. R. Co. v. Henthorne,* 73 Fed. 634, 43 U. S. App. 113.

5. The following instruction, requested by defendant, was refused, and error is claimed because of such refusal:

"You are instructed that if the defendant used reasonable care in the employment of the hoister, Mertes, and was satisfied that he was a fit and competent man to perform the duties of hoister, the defendant performed his full duty, and is not liable for a careless act of the hoister, unless the hoister, between the hiring of the hoister and the time of the accident, became incompetent and the defendant had knowledge thereof."

There are two answers to this assignment: First, the instruction is one touching the general question of the liability of the defendant, is not applicable to any of the questions of fact submitted by the special verdict, and hence could not properly be given to the jury. Second, it is erroneous because it requires that the defendant should have actual knowledge of the subsequently acquired incompetency of the servant, whereas it is sufficient if in the exercise of reasonable care the defendant should have ascertained the fact of such incompetency. *Kamp v. Coxe Bros. & Co.* 122 Wis. 206, 99 N. W. 366.

6. The court instructed the jury that "ordinary care in such a case is such care as the great mass of mankind would have exercised under the same circumstances." It is claimed that this definition is erroneous because it did not also add the words "engaged in a similar employment." It seems sufficient to say in answer to this that the words "under the same circumstances" necessarily include the idea of a similar employment. The definition seems sufficiently accurate, under the recent case of *Pumorlo v. Merrill,* 125 Wis. 102, 103 N. W. 464, though it would be more accurate had it read "such

care as the great mass of mankind ordinarily (*or* usually) exercise under the same or similar circumstances."

7. The deposition of James Patton, an officer of the defendant company and the superintendent of the dock, was taken before the trial under the provisions of sec. 4096, Stats. 1898, and was received and read in evidence against the defendant's objection, based on the ground that the witness was present in court. It is contended that this was error under the ruling of this court in the case of *Hughes v. C., St. P., M. & O. R. Co.* 122 Wis. 258, 99 N. W. 897. In that case the depositions of a conductor and engineer of a railroad train, taken under sec. 4096 as amended by ch. 244, Laws of 1901, were held not to be admissible when the witnesses were present at the trial, on the ground that they were mere employees, and in no sense parties to the action. In *Meier v. Paulus,* 70 Wis. 165, 35 N. W. 301, it was held that the examination of a party to the action taken under sec. 4096 was a substitute for the old bill of discovery, and was admissible as original evidence in the nature of an admission. Since that decision the section aforesaid has been amended, so that in case a private corporation be a party the examination of the president, secretary, or other principal officer of the corporation, or of the person who was such president, secretary, officer, agent, or employee at the time of the occurrence of the facts which are the subject of the examination, may be taken under it. In the present case the examination of Patton was not the examination of a mere employee as in the *Hughes Case,* but the examination of an officer who, under the evidence, must be held to be one of the principal officers of the corporation. The question is simply as to the meaning and intent of the statute as amended. Fairly construed, does it make the president, secretary, or other principal officer of a corporation in effect *a party,* so that his examination becomes independent evidence in the case, notwithstanding his presence in court? It seems to us quite obvious that this question must be answered in the af-

firmative.    The apparent effort was to give the right to obtain discovery in cases to which a corporation is a party as fully as in cases where an individual is a party.    This effort would certainly be defeated if it be held that the examination cannot be read in evidence in case the officer be present in court. Viewing the statute in the light of the defect to be remedied, we think the reasonable construction is that the examination of the officer named becomes the examination of a party, and may be introduced in evidence against the corporation, under the doctrine of the case of *Meier v. Paulus, supra.*

8.  It is contended that the damages, even as cut down by the trial court, are excessive.    The injuries resulting from a fall of nearly thirty feet were necessarily quite severe at the time.    Whether there are resulting permanent disabilities was a question in dispute by the experts.    The boy was still suffering some ill effects at the time of the trial of the action, more than three months after the accident.    We have examined the evidence and do not feel that we can say that the damages finally adjudged are excessive.

*By the Court.*—Judgment affirmed.