Zoesch, Administratrix, Appellant, vs. Flambeau Paper
Company, Respondent.

*December 17, 1907—January 8, 1908.*

*Master and servant: Negligence: Personal injuries to servant: Safe
place and appliances: Scope of employment: Court and jury:
Nonsuit:* Res gestæ: *Conjecture: Contributory negligence: Dis-
covery: Examination before trial: Deposition of witness pres-
ent in court: Appeal and error: Harmless error.*

1. In an action for the negligent killing of a servant while engaged
   in discharging a steam boiler, the evidence, stated in the opin-
   ion, is *held* to have required submission to the jury of the ques-
   tion of the master's negligence in failing to provide a safe
   place and appliances for the performance of the operation.
2. In an action for the negligent killing of a servant while engaged
   in discharging a steam boiler, the evidence, stated in the opin-
   ion, is *held* to have required submission to the jury of the ques-
   tion whether the servant was within the line of his employ-
   ment, or was disobeying orders, when the accident happened.
3. In such case if it appeared that the servant was in fact a subor-
   dinate and knew or ought to have known that he was subject
   to orders, and that he disobeyed such orders, and as a result
   of such disobeyance suffered his injuries and death, there
   could be no recovery.
4. Where a servant was injured while assisting in discharging a
   steam boiler, his declaration while being removed from the
   place where he was injured: "The thing stopped running, and I
   opened it up a little bit, and the whole end blowed out on me,"
   is part of the *res gestæ*, and affirmative evidence of the facts
   stated.

5. In such case a finding that the accident happened in the manner stated in such declaration would be a finding based upon evidence, not upon conjecture.

6. In an action for the negligent killing of a servant engaged in discharging a steam boiler, the evidence, stated in the opinion, is *held* to show that the discharge pipe became obstructed and the flow stopped for some reason and that in opening the valve wider the obstruction was suddenly removed and the accident happened.

7. In an action for the negligent killing of a servant engaged in discharging a steam boiler, the evidence, stated in the opinion, is *held* to require submission to the jury of the question of contributory negligence.

8. In an action against a corporation for the death of a servant the defendant's superintendent was examined under sec. 4096, Stats. (1898), and a part of his evidence so taken introduced by plaintiff against objection on the first day of the trial. On the second day, the superintendent being present in court, the court struck out that part of his deposition already introduced and he was put on the stand by the plaintiff and testified at length. *Held*, that such ruling was not prejudicial, since the superintendent was not an officer of the corporation, but a mere employee, and it also appeared that his evidence given on the trial substantially covered that given by him in his deposition.

APPEAL from a judgment of the circuit court for Douglas county: A. J. VINJE, Circuit Judge. *Reversed.*

This is an action by the plaintiff, as administratrix, to recover damages for the death of one Bernard Zoesch, her husband, an employee of the defendant, which death is alleged to have been caused by the negligence of the defendant in not furnishing him a safe place to work and not instructing him or warning him of the danger to be apprehended. At the time of his death the intestate was a common laborer about thirty years of age and had been employed for a year by the defendant in its paper mill at Park Falls, Price county, as size maker and general utility man. He had no experience as an engineer, but had on several occasions worked in the fire room assisting the firemen in putting fuel in the furnace, but had not assisted in discharging a boiler. The defend-

ant's mill was operated by steam produced by a battery of six
large boilers standing side by side and inclosed with brick-
work in the boiler room.   At the east or rear end of this row
of boilers there was a passageway about five feet in width and
forty-five feet in length, formed by the east wall of the boiler
room on one side and the brick wall inclosing the boilers at
the other.   This passageway was inclosed by a brick wall at
the north end, and had two windows and a door leading out of
doors on the east side, the door being nineteen feet south of
the north wall.   Each boiler was fitted with a four-inch dis-
charge pipe about two feet above the floor and extending into
the passageway at right angles about two and one-half feet,
and having a straightaway or gate blow-off valve at the end.
These pipes were used for the purpose of discharging the
steam and hot water from the boilers, and two of the boilers
were discharged and cleaned every Sunday.   In discharging
a boiler an iron elbow was screwed into the discharge pipe,
its mouth being a foot or so from the floor when in position
and immediately above a wooden trough running along the
floor of the five-foot passage next to the outside wall.   This
trough was usually covered with long boards, but when a
boiler was discharged the board was taken off, a tin pipe two
feet or so in length was slipped loosely over the mouth of the
elbow and inserted in a slanting position into the trough, the
valve was then opened, and the contents of the boiler thus
allowed to run into the trough, which extended out of the
mill and discharged into the river.   These were the only
means and appliances furnished for the purpose of discharg-
ing the boilers.   The work of discharging the boilers was al-
ways done by the firing crew, which ordinarily consisted of
four men, viz., one head fireman, a second fireman, and two
helpers.   There were two firing crews or shifts, one going on
duty at 6 o'clock p. m. and the other at 7 o'clock a. m.; but
on Sunday the night crew staid on duty until noon (except
one helper), and it was their duty to prepare the boilers

which were to be cleaned and to actually discharge them if the contents were sufficiently cooled before the shift ended; otherwise the other crew, which went on duty at noon Sunday, took up the work and completed it. In discharging the boilers after drawing the fires the custom was to draw off some of the contents, then pump cold water into the boiler, and by this alternate process cool it off and discharge it gradually.

On Saturday, October 24, 1903, the deceased worked all day at his usual work. Some time in the afternoon he applied to Mr. Boulton, the superintendent of the mill, for extra work, and was told that he could go to work at midnight in the fire room and help fire. The night shift was one man short that night, and the testimony tended to show that one Meyers, the head fireman, was the man who was not on duty. Plaintiff's claim was that the deceased was hired to take Meyers' place, and that his duties as a fireman did not end until noon on Sunday; but defendant's claim was that he was only employed until 7 o'clock a. m., when his duties under that employment ceased. The deceased went to work at midnight in the fire room with one Belter, who was second fireman, and both worked until 7 a. m. At that time deceased went home and got breakfast and returned at about 8 o'clock. Boulton claims that when deceased came back at 8 o'clock he met him in the boiler room and told him to go to work cleaning out a pulley on the dynamo, and after that to help about some pipe fitting. It is claimed by plaintiff that Belter's evidence tends to contradict this testimony, and the testimony on the subject will be fully stated in the opinion. Belter was at work cleaning the grates when deceased came back. He testified that the deceased turned on the steam hose used to blow out the flues, and, further, that at about 9 o'clock, or somewhat later, he and Zoesch went into the passageway where the discharge pipes are, and that he (Belter) screwed on the elbow, adjusted the tin pipe, and

turned on the valve of boiler No. 6 (which is the boiler at the extreme north end) about half, and the water and steam commenced to discharge; that he told Zoesch the valve was open far enough, and that he and Zoesch then went up on a platform where the water gauges were, and he told Zoesch to watch the glass till it got down to one inch and then go down and close the valve; that he (Belter) then went down below to his work in front of the boilers, and in three or four minutes Zoesch hollered to him to come up and see how fast the water was going down, and he hollered back to watch until it went down to one inch; that in a few moments he heard Zoesch hollering for help, and he (Belter) ran around into the five-foot passage and found Zoesch crawling out on hands and knees, with much hot water running on the floor and much steam escaping; that he and one Retloff helped Zoesch out of doors and in ten or fifteen minutes he went back into the passageway and found the valve turned wide open, the elbow tight, and the loose pipe lying beside the boiler. One Russell testified that he was present when Belter and Retloff brought Zoesch out of the boiler room, and that he said to Zoesch: "Good God, Ben! What's the matter? What's happened to you?" and Zoesch moaned and said: "The thing stopped running and I opened it up a little bit, and the whole end blowed out on me." Zoesch died of his injuries on the evening of the same day. At the conclusion of the plaintiff's evidence the court allowed several amendments to be made to the complaint so as to conform to the proofs, and then granted defendant's motion for a nonsuit and entered judgment of dismissal of the complaint, from which plaintiff appeals.

*T. M. Holland* and *F. F. Wheeler,* for the appellant.

For the respondent there was a brief by *Howard L. Abbott* and *Ross & Dwyer,* and oral argument by *W. D. Dwyer.*

WINSLOW, C. J. Four general contentions are made in support of the judgment of nonsuit, viz.: (1) That it appears

that the respondent furnished a reasonably safe place and appliances; (2) that the deceased was not within the line of his employment, or was disobeying orders, when the accident happened; (3) that the manner in which the accident happened is mere matter of conjecture; and (4) that, if this latter proposition be not correct, then the accident was caused by the negligence of the deceased himself.

1. We cannot regard the first proposition as sound. Steam in large quantities and under pressure is well known to be a highly dangerous agent to handle and control. To discharge a large boiler full of boiling water and steam at a pressure of fifty pounds to the inch (as the testimony tended to show was the case here) is manifestly a task requiring not only fit and suitable appliances but careful management. There is in the case testimony by two witnesses, familiar with the appliances in use in other mills for this purpose, to the effect that the ordinary and usual way to arrange the blow-off pipe is to carry the same outside of the building, so that it will blow off in the open air, or to extend it into another pipe in connection with other boilers, or to extend it into a closed sewer or sewer basin, and that it is not usual to have the discharge pipe blow off inside the boiler room, on account of the danger to the man at the valve and the danger of fracturing the boiler. There was certainly ample evidence to carry to the jury the question whether the defendant was negligent in failing to provide for its employees a safe place and appliances for the performance of this operation.

2. Whether there was evidence from which the jury could find that the deceased was within the line of his duty in attempting to assist in the operation of blowing off the boiler is a question of greater difficulty. It is admitted that the night shift of firemen on Saturday night remain on duty until Sunday noon, and that it is a part of their duty on Sunday morning to prepare two boilers for discharge and cleaning, and to discharge them if the contents are sufficiently cooled before their time is up. Meyers, the head fireman, was off

duty on the night in question, and Boulton, the superintend-
ent, testifies that he told the deceased to go to work at mid-
night and help on the fire. When asked if he (Boulton)
told the deceased to quit at 7 o'clock in the morning he an-
swered, "Seven o'clock in the morning, supposed his time was
up." But this answer was stricken out by the court and he
was again asked if he told him to quit at 7 o'clock, to which
he answered, "Told him I only wanted him for the night."
This forms the only direct evidence of the terms of his em-
ployment. Boulton further testifies, however, that Zoesch
went home to breakfast at 7 and returned at 8; that he saw
him when he returned and immediately set him at work at
other tasks. From this testimony it is claimed that it is
clearly shown that Zoesch was not employed as a fireman or
fireman's helper after 7 o'clock a. m. and was a mere volunteer
in the boiler room when the accident happened. But it is very
significant that Boulton declined to testify that he told the
deceased to quit at 7 a. m., but would only say that he told
him "he only wanted him for the night." Now Zoesch was
admittedly put to work to take the place of a man on the night
shift who was off for that night. The duties of the night shift
continued on Sunday until noon, and Zoesch undoubtedly
knew this fact. Under such circumstances, what is the fair in-
ference to be drawn from the words testified to by Boulton?
Are they so certain in their meaning that but one conclusion
could be drawn, namely, that Zoesch was to quit at 7 o'clock,
or might he fairly and honestly construe them as meaning
that he was put upon the night shift, and that employment
for the night meant employment to perform the duties of a
member of the night shift?

We confess that the latter inference seems to us fairly
capable of being drawn from the words used under the cir-
cumstances surrounding the parties. There is direct evi-
dence tending to show that Zoesch so understood, for Belter
testified that Zoesch told him in the morning, after he came

back from breakfast, that he was there in Meyers' place.
Even taking Boulton's story of the transaction between him
and Zoesch after breakfast to be true, it seems clear that they
both understood that Zoesch's time of service was not over at
7 o'clock; for Boulton, without any word of surprise at his
return and without any new contract of employment, imme-
diately set him at work, apparently as if the former employ-
ment still persisted until noon.   This conversation between
Boulton and Zoesch in the boiler room at 8 o'clock a. m., at
which Boulton claims that he set Zoesch at other work, is
said to be undisputed, and is relied on by respondent as con-
clusively showing that he was out of the line of his employ-
ment when later he was assisting in the discharge of the
boiler.  'We think it cannot have any such conclusive effect,
for two reasons: First, Boulton testified that Belter was
standing but a few feet distant when this conversation took
place, while Belter entirely denies hearing any such conversa-
tion, and also denies that Boulton was in the boiler room to
his knowledge at any time during the morning, so the ques-
tion whether any such conversation ever took place is in dis-
pute under the evidence; second, there is nothing to show
that Zoesch did not do the jobs referred to by Boulton and
finish them before going to work at the boilers.  About an
hour's time seems to have intervened, according to the testi-
mony, before operations were begun on the boilers, and, if
Zoesch was justified in concluding that his employment as
fireman did not close until noon, no reason is perceived why
he might not rightly return to the ordinary duty of a fireman
after performing the special jobs at which Boulton set him.

But it is further insisted that Zoesch was employed simply
as an assistant fireman or helper and became a subordinate
of Belter, the second fireman, and that in meddling with the
valve at all he disobeyed the orders of his superior.  The evi-
dence is much confused as to the duties and authority of the
head fireman as well as to the place which Zoesch really occu-

pied.  Boulton testified that the firemen ranked about the same; that the head fireman got a little more pay; "that he kind of looks after things and tells them to put more fuel in;" that with regard to cleaning the boilers "he might tell them to turn the water on the hose, to start the pumps, or something like that; but, as I said before, *they all work together.*"   Thus it appears that the authority of the head fireman is very vague and illy defined, if it exists at all. There is no testimony that Belter was made head fireman for the night by any special order or that there was any custom to that effect.   Zoesch seems to have considered himself head fireman because Meyers was off duty, and his claim does not seem to have been disputed by Belter; but when it came to cleaning the boiler, Belter, who had experience, assumed to give directions, which Zoesch received without dissent or protest.  Under this contradictory state of the evidence we cannot say that the question was not fairly for the jury.   Of course, if it appeared that Zoesch was in fact a subordinate and knew or ought to have known that he was subject to the orders of Belter, and that he disobeyed such orders, and as a result of such disobedience suffered his injuries and death, there could be no recovery; but we are unable to say that these facts appeared by undisputed evidence or by such overwhelming preponderance thereof as to justify taking the question from the jury.

3. The contention that the question as to how the accident happened can only be a matter of conjecture is not tenable. It seems to be certain that for some reason Zoesch went down to the valve and turned it on, so that a sudden and overwhelming rush of boiling water and steam then resulted, from which he could not escape.   The evidence of Russell tends to show that when Zoesch was taken out of doors he at once said, "The thing stopped running, and I opened it up a little bit, and the whole end blowed out on me."  This was unquestionably part of the *res gestæ,* and is affirmative evidence of the

facts stated. *Christianson v. Pioneer F. Co.* 92 Wis. 649, 66 N. W. 699; *Hupfer v. Nat. D. Co.* 119 Wis. 417, 96 N. W. 809. The valve was afterwards found to be turned on in full. So there was in the case proof that the flow stopped 'for some reason, and that in opening the valve wider the obstruction was suddenly removed and the accident happened. This was not an incredible state of facts, as there was evidence that the water in the boiler was river water and liable to form large amounts of scale which might obstruct the flow; and again, Zoesch had received no instruction or command from Belter as to what to do in case the flow stopped, so in this case there would be no disobedience of orders, even if Belter was the superior. A finding that the accident happened in this way would be a finding based upon evidence and not upon conjecture.

4. Little need be said upon the contention that Zoesch was guilty of contributory negligence as a matter of law. Zoesch was a common laborer, without experience in performing this dangerous work, and he had received no warning of the danger nor instruction save such as Belter may have given him. It was admittedly the duty of the night shift, working together, to discharge the boiler. If he was reasonably justified in concluding that he was employed as a member of the night shift until noon, he was in the line of his duty in attempting to discharge the boiler. If he was in fact Belter's subordinate and knew or ought to have known that fact, and was injured because he disobeyed Belter's instructions, he would be guilty of contributory negligence; but if he disobeyed no instructions, or was justified in believing that he was Belter's superior, then the court could not say as matter of law that he was guilty of contributory negligence. Under the evidence the question was for the jury.

5. The evidence of Boulton, the superintendent of the mill, was taken under sec. 4096, Stats. (1898), before trial, and a part of it was introduced by the plaintiff against ob-

jection on the first day of the trial. On the second day Boulton was present in court, and, on attention being called to that fact, the court struck out that part of the deposition already introduced and Boulton was put upon the stand by the plaintiff and testified at length. The plaintiff now complains of the ruling striking out the deposition. There are two sufficient answers to this objection: (1) Boulton was not an officer of the corporation, but a mere employee; hence under the rule announced in *Hughes v. C., St. P., M. & O. R. Co.* 122 Wis. 258, 99 N. W. 897, and *Johnson v. St. P. & W. C. Co.* 126 Wis. 492, 105 N. W. 1048, the deposition was not admissible when the witness was present. (2) The evidence of Boulton given on the trial substantially covered the evidence given by him in his deposition; hence no prejudicial result could follow from striking out the deposition.

Some minor rulings on evidence are complained of, but we do not deem it necessary to discuss them.

*By the Court.*—Judgment reversed, and action remanded for a new trial.